**Dr. Judith PIESCO, Plaintiff-Appellee,**

**v.**

**Edward I. KOCH, Defendant,**

**The City of New York, Department of Personnel, Juan Ortiz and Nicholas LaPorte, Jr., Defendants-Appellants.**

**No. 140, Docket 93-7149.**

United States Court of Appeals, Second Circuit.

Argued Sept. 23, 1993.

Decided Dec. 10, 1993.

334

Ronald Podolsky, New York City (Sharon C. Konits, on the brief), for plaintiff-appellee.

Kristin M. Helmers, New York City (O. Peter Sherwood, Corp. Counsel, City of New York, Stephen J. McGrath, Ruby Bradley, Paul Marks, on the brief), for defendants-appellants.

Before: MESKILL, KEARSE, and WINTER, Circuit Judges.

KEARSE, Circuit Judge:

This case, previously before this Court on appeal from the granting of summary judgment in favor of defendants, returns to us following the entry of judgment in favor of plaintiff after trial. Defendants City of New York (the "City"), its Department of Personnel, Juan Ortiz, and Nicholas LaPorte, Jr., appeal from a judgment entered in the United States District Court for the Southern District of New York after a jury trial before John S. Martin, Jr., *Judge*, awarding plaintiff

Dr. Judith Piesco $1,800,000 in compensatory damages against all defendants, $50,000 in punitive damages against Ortiz, and $50,000 in punitive damages against LaPorte, on her claim under 42 U.S.C. § 1983 (1988) for termination of her employment in retaliation for the exercise of her speech rights under the First Amendment to the Constitution. On appeal, defendants contend principally that the district court should have granted their posttrial motion for judgment as a matter of law or, in the alternative, for a new trial. They also contend that, absent judgment as a matter of law or a new trial, the court should have reduced and vacated the compensatory and punitive damages awards, respectively, on the ground that those awards were unsupported by the evidence. For the reasons below, we uphold the refusal to grant judgment to defendants as a matter of law, but we vacate the denial of a new trial and remand for consideration of the new-trial motion under the proper legal standard.

## I. BACKGROUND

The events leading to the present lawsuit, taken in the light most favorable to Piesco, revealed the following.

### A. *The Hiring and Firing of Dr. Piesco*

The City's Department of Personnel ("DOP") was responsible for developing and administering employment examinations for various City jobs. From 1981 until 1986, Ortiz was DOP's Director; LaPorte was its First Deputy Director. In the summer of 1982, during a period in which numerous DOP-administered employment examinations were facing legal challenges on the ground that they had discriminatory impact on minority applicants, Ortiz and Laporte sought to hire a Deputy Director for Examinations who would be the third highest official at DOP, behind Ortiz and LaPorte, and whose primary responsibility would be to oversee the written tests to be administered to applicants for City jobs. Qualifications for that position included the ability to design tests that would withstand legal challenges and the ability to work well with other high-ranking City officials while helping to shape and implement strategies devised by Ortiz and La-

Porte. On September 20, 1982, Ortiz and LaPorte hired Piesco for the position.

By all accounts, Piesco's tenure at DOP began well. For the period September 20, 1982, to June 30, 1983, both Ortiz and LaPorte rated her work "outstanding," concluding that Piesco had "proven to be a valuable asset to this agency." As discussed in Part I.B. below, however, there is substantial dispute as to the quality of her performance thereafter.

In December 1984, DOP administered Examination Number 4061 ("No. 4061"), a test for whose development Piesco's bureau had responsibility, for the position of entry-level police officer. The test was modeled after the previous test for that position, Examination Number 1175 ("No. 1175"), but apparently was simplified by the removal of several complex questions. In February 1985, representatives from DOP and the Police Department met to set the "pass mark" for No. 4061, *i.e.*, the score deemed to be the minimum passing grade. The pass mark for No. 1175 had been 82 (115 correct answers out of 140), but Piesco, arguing that No. 4061 should have a higher pass mark to compensate for its reduced complexity, pressed for a pass mark of 89 (125 correct out of 140). She argued that anything less would pass unqualified candidates. Eventually, the matter was compromised, and the pass mark was set at 85. Piesco testified that she had viewed that mark as inappropriate but had essentially thrown up her hands, stating, "You do what you want to do." In contrast, one participant at the meeting testified that Piesco did not express any disagreement with setting the mark at 85 when that compromise was reached. Ortiz testified that Piesco told him that though a pass mark of 89 was preferable, 85 was acceptable, and "she could live with an 85."

In early 1985, the New York State Senate Committee on Investigation, Taxation, and Government Operations, chaired by Senator Roy M. Goodman, established a committee to review the City's Police Department ("Goodman Committee"). Representatives of the Goodman Committee met with Piesco, Ortiz, and LaPorte at the DOP offices in June 1985. At that meeting, Piesco told them that, in her

view, given the pass mark of 85, any moron could pass No. 4061.

Ortiz testified that he was surprised to hear this view because he had met with Piesco at least once every two weeks and she had never complained to him that the pass mark was too low. He also testified that after that initial meeting with the Goodman Committee representatives, Piesco recanted and agreed with him that 85 was an acceptable pass mark. In the wake of that meeting, Laporte suggested to Piesco that she needed to "learn to tell the truth more creatively," in light of the potential for negative publicity from use of terms such as "moron." During the following month, Piesco twice went to meet with representatives of the committee but did not disclose those meetings to Ortiz or Laporte.

On July 11, 1985, Piesco testified at a hearing of the Goodman Committee. At that hearing, Senator Goodman asked Piesco, "Would a functional illiterate pass the entrance examination to the Police Academy?" Piesco answered, "At the pass mark set, I would say that it is possible." There was apparently no attempt during the hearing to define either "functional illiterate" or "possible" with any specificity. At trial, in response to questioning from the court, Piesco clarified that by "functional illiterate" she meant "people who may not be able to appropriately read and write and understand," or "who could read words but could not draw enough inference from what they were reading to apply the concepts, particularly within the context of a given function, such as to be a police officer you have to understand concepts such as illegal search and seizure"; by saying that it was "possible" that such persons could pass if the pass mark were 85, she meant "likely."

Ortiz sent a letter to the Mayor on the day after Piesco's committee testimony, calling that testimony "irresponsible." He testified at trial that his first opportunity to try to discuss in detail with Piesco why she felt the 85 pass mark was unacceptable was a meeting on July 31, 1985. He began by asking her whether she had read the exam, but she stood up and said, "You don't know a fucking thing about testing. I am fed up with your bullshit and ineptitude." When Ortiz asked Piesco to calm down, she responded, "I don't have to do a fucking thing, why don't you fire me?" Ortiz promptly terminated the meeting and placed a letter of reprimand in Piesco's personnel file.

As indicated above, Piesco's performance for the first nine months of her tenure was rated "outstanding." For the following year, 1983–84, her performance was rated "very good," and in March 1983, July 1983, and May 1984 she received the maximum permissible merit raises in salary. For the year ending June 30, 1985, however, Ortiz and Laporte rated Piesco's performance "marginal." Both testified that the ratings were indicative solely of the continual decline they had observed in Piesco's performance (see Part I.B. below), and that they had scrupulously avoided considering Piesco's remarks to the Goodman Committee because those remarks occurred after June 30, the end of the evaluation period. LaPorte informed Piesco of the 1984–85 evaluations personally on August 13, 1985. He testified that Piesco responded, "This is horseshit, that I am—this is war, I am going to sue, I am going to Gabe Pressman, this is going to be on TV, you are going to regret this, I am going to get you."

Piesco promptly filed a complaint with the City's Department of Investigation ("DOI"), alleging that defendants had improperly placed the reprimand letter in her file, had excluded her from important meetings, and had given her unjustified unfavorable evaluations. Piesco alleged that at no time before her testimony to the Goodman Committee had she been informed that her conduct was considered marginal; she asserted that the unfavorable personnel actions were taken by Ortiz and Laporte solely in retaliation for her testimony to that committee. In early December 1985, DOI concluded that it had not been improper for Ortiz to place a letter in Piesco's file criticizing her conduct at the July 31 meeting or for defendants to exclude her from certain other meetings. DOI concluded, however, that although the factual bases for the conclusions in the August evaluations of Piesco were substantially accurate, the evaluations had not been prepared in

accordance with DOP's own procedures. A formal report eventually issued by DOI, dated January 10, 1986 ("DOI Report"), elaborated that, prior to the evaluations, the descriptions of the "key responsibilities" and "performance expectations" of Piesco's position had been changed without discussion with Piesco in accordance with DOP's normal procedures. Hence, DOI recommended that the evaluations be redone. The report also concluded that the performance evaluations had been "improperly prepared by LaPorte and Ortiz so as to highlight criticism of [Piesco's] conduct. This treatment resulted, in part, from her testimony at the Goodman hearing." (DOI Report at 1.) The City's First Deputy Mayor Stanley Brezenoff asked Ortiz to follow DOI's recommendation and redo the evaluations by discussing the position description changes with Piesco. Ortiz refused, taking the position that the DOP procedures referred to by DOI were informal rather than mandatory, that those procedures were designed to ensure that the employee was aware of what performance was expected, that Piesco was aware of the requirements as described in the August evaluation, and that the procedural changes therefore had no substantive effect on the evaluation.

On December 27, 1985, Ortiz terminated Piesco's employment.

### B. The Present Lawsuit and the Defendants' Justifications

In the meantime, on December 19, 1985, Piesco commenced the present action under 42 U.S.C. § 1983, alleging principally that defendants' unfavorable personnel actions had been taken in retaliation for her testimony to the Goodman Committee, in violation of her First Amendment rights. The complaint was amended shortly thereafter to allege that the dismissal of Piesco on December 27 was a further act of retaliation. The amended complaint sought more than $8 million in compensatory and punitive damages.

Following a period of discovery, defendants moved for summary judgment dismissing the complaint. That motion was denied by District Judge Edelstein, to whom the matter was then assigned. After the case

was reassigned to Judge Martin, defendants successfully sought reconsideration. In an opinion reported at 753 F.Supp. 468 (1990) ("*Piesco I*"), Judge Martin found that although Piesco's testimony before the Goodman Committee addressed matters of public concern, Piesco "had the obligation to insure that her comments accurately reflected legitimate concerns, did not exacerbate unnecessarily a sensitive public issue and did not unfairly undermine the judgment made by her superiors and the senior officials of the Police Department." *Id.* at 474. The court concluded that Piesco's statements were inappropriate and irresponsible, and hence her right to make those statements was outweighed by the City's interest in promoting the efficiency of the public services it performed. Accordingly, it concluded that the First Amendment claim should be dismissed. The court found, alternatively, that the claim should be dismissed on the grounds that Piesco's outburst of expletives at the July 31, 1985 meeting tipped the balance in favor of the defendants and that Ortiz and Laporte were entitled to qualified immunity.

On appeal, this Court overturned the granting of summary judgment on Piesco's First Amendment claim, ruling that defendants had no immunity and that the district court had given insufficient weight to the inherent First Amendment value of Piesco's interest in testifying before the Goodman Committee. *Piesco v. City of New York*, 933 F.2d 1149 (2d Cir.) ("*Piesco II*"), *cert. denied*, —— U.S. ——, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991). We noted that a legislative committee conducting an investigation needs honest and candid testimony in order to determine how to legislate wisely and effectively, and we concluded that Piesco's "right to give truthful answers before the Committee t[ook] precedence over the City's interest in efficiently performing government services." *Id.* at 1158. Accordingly, the matter was remanded for trial.

At trial, defendants sought to show that Piesco's testimony before the Goodman Committee had not been truthful and that their treatment of her had nothing to do with her testimony. The bulk of their evidence was aimed at showing that after Piesco's favor-

able beginning with DOP, her performance had deteriorated, largely as a result of her aggressive and confrontational manner. Judith Levitt, who was Deputy Chief of the General Litigation Division in the City's Law Department when Piesco was hired, testified that she began to complain to Ortiz and Laporte almost immediately about Piesco's confrontational and vituperative behavior in meetings. LaPorte testified that in late 1983 or early 1984 he began to receive similar complaints from high-ranking City officials. Various City officials testified to specific incidents, including the following.

In a May 1984 meeting with LaPorte, Ortiz, and representatives of the Hispanic sanitation workers, Piesco said that Norman Steisel, the Sanitation Department Commissioner, was "a fucking liar." When this was reported to Steisel, who had not been present at the meeting, he called Ortiz to complain and to suggest that Piesco be fired. Ortiz testified that he declined to fire Piesco at that time, but he spoke with her about her conduct and was assured that it would not be repeated.

At the February 1985 meeting to set the pass mark for No. 4061, City Police Commissioner Benjamin Ward argued that the appropriate pass mark was 82, both because 89 would have a disproportionate impact on minority applicants and because it would yield insufficient recruits to fill vacancies. In response, Piesco erupted: "Are you out of your fucking mind?" Ward subsequently told Piesco's superiors that he could no longer work with her.

At an otherwise quiet March 1985 meeting at the office of Deputy Mayor Brezenoff, Piesco suddenly turned on the Police Department's Chief of Personnel, Richard Koehler, and called him a liar. As a result, Police Commissioner Ward suggested that if Piesco were in his department he would fire her. Ortiz testified that Brezenoff telephoned him to ask, " '[w]ho was that person that you brought to the meeting that called Chief Koehler a liar,' " and " '[w]ho picked her?' " Brezenoff advised Ortiz to " 'watch' " Piesco and " 'tell her to watch her mouth because we don't go around the city calling fellow commissioners liars'." Brezenoff testified

that although profanity was occasionally used in meetings, it could not be tolerated as personal invective and *ad hominem* attack.

Ortiz testified that in the aftermath of that March 1985 meeting, he was inclined to fire Piesco but that LaPorte persuaded him not to do so, arguing that Piesco was in the middle of important projects and that the outbursts likely were isolated instances. The eruptions and inappropriate characterizations continued, however. On several occasions thereafter, according to her own testimony, Piesco referred to Police Commissioner Ward, a Black, as a "baboon." Brezenoff testified that her epithets were the subject of considerable discussion among City officials. At a May 1985 meeting at the Corporation Counsel's office, Piesco refused to engage in a rational discussion of the problem at hand and was so belligerent and obstructive that LaPorte was forced to halt the meeting several times and tell her to stop. After the meeting, when LaPorte told Piesco he found her behavior incomprehensible, Piesco told him, using anatomical slang, that she had just been giving the Deputy Corporation Counsel a hard time because she knew she could. LaPorte testified that he continually admonished Piesco about her behavior.

Ortiz testified that by early in the summer of 1985, he had concluded that he could not trust Piesco at sensitive meetings and refused to let her attend them. Some City officials refused to attend meetings if Piesco was scheduled to attend. Levitt, who in February 1986 succeeded Ortiz as DOP's Director, testified that if Piesco had not been fired by Ortiz in December 1985, "my first act of my first day" would have been to fire her.

In addition, defendants sought to show that Piesco was not genuinely concerned about the contents of No. 4061 or its pass mark but was pursuing her own personal goals. They pointed to the fact that Piesco had not read No. 4061 through before it was administered or indeed prior to the setting of the pass mark. Ortiz testified that prior to her testimony at the Goodman Committee hearing, Piesco had never come to him to indicate any dissatisfaction with the test or its pass mark. LaPorte and Ortiz also stated

that they were unable to get any scientific support from Piesco for her contention that an 85 pass mark would pass functional illiterates. They also offered evidence that Piesco had told others that Ortiz was "on his way out" and that she wanted his job.

Further, in early 1985, Ortiz became concerned that Piesco could not be trusted to maintain appropriate confidentiality. He testified that he learned that Piesco had discussed the February 1985 pass mark meeting with a then-recently fired City employee and that information discussed at that meeting shortly appeared in press reports. Ortiz and Laporte testified that in the months following Piesco's testimony before the Goodman Committee, Piesco became even more difficult to work with as she seemed preoccupied with her status as a celebrity. They were unable to discuss any matters of importance with her for fear of seeing them reported in the newspapers the next morning.

Contrary to defendants' testimony as to the criticisms of Piesco, Piesco testified that she had never been told by Ortiz or Laporte that any of her behavior was inappropriate. Other witnesses testified that obscenity was frequently used at meetings and that they did not consider Piesco's outbursts inappropriate. Several witnesses from the Police Department, Sanitation Department, and Fire Department praised Piesco's job performance.

Piesco also testified that her opposition to the pass mark for No. 4061 was based on the reduced complexity of the test, the fact that the person who developed the test was conducting a tutoring program, and the fact that examination proctors read the test's instructions orally to the candidates. Piesco also had writing samples from successful candidates that she said exhibited functional illiteracy.

### C. The Verdict and the Denial of Defendants' Posttrial Motions

The jury, with appropriate instructions as to the burdens of proof, was asked to return a special verdict determining, as to liability, (1) whether Piesco's statements before the Goodman Committee were constitutionally protected, (2) whether the fact that she made those statements was a substantial or motivating factor in defendants' decision to terminate her employment, and (3) whether defendants would have dismissed her even if she had not made those statements. As to the first question, the jury was instructed that it must find that Piesco's statements were protected if it found that her testimony before the committee was truthful and responsive to the questions asked.

The jury answered the first two liability questions in the affirmative, finding that Piesco had established by a preponderance of the evidence that her statements to the Goodman Committee were constitutionally protected and that the fact that she made those statements was a substantial or motivating factor in defendants' decision to discharge her. The jury found that defendants had not established by a preponderance that they would have dismissed Piesco regardless of her statements. In response to questions addressed to damages, the jury found that Piesco should receive $1,800,000 as compensatory damages, and that she should receive $50,000 each from Ortiz and Laporte as punitive damages.

Defendants, having moved for a "directed verdict" at the close of the evidence, moved after trial for judgment as a matter of law or, in the alternative, a new trial; they also moved to reduce the compensatory damages award on the ground that it was excessive and to set aside the punitive damages award on the ground that it was unsupported by the evidence. In an Opinion dated February 8, 1993, 1993 WL 37100 ("Posttrial Opinion"), the district court denied all of these motions. It denied the motion for judgment as a matter of law principally because of *Piesco II*'s reversal of summary judgment. The district court held that "[w]hile the facts developed at trial were slightly different than those before the Circuit Court on the summary judgment motion, the additional facts presented do not justify this Court in reaching a different conclusion...." Posttrial Opinion at *2. As discussed in greater detail in Part II.B. below, the court denied the new trial motion on the ground that the jury's verdict, though in the court's view "seriously erroneous," was not "egregious." *Id.* at *2. The

court rejected defendants' requests for relief from the damages awards, finding that those awards, while high, were not so high as to be excessive.

This appeal followed.

## II. DISCUSSION

On appeal, defendants pursue their contentions that they were entitled to judgment as a matter of law, a new trial, or relief from the damages awards. For the reasons below, we conclude that the district court properly denied defendants' request for judgment in their favor as a matter of law but applied the wrong standard to the motion for a new trial.

### A. The Motion for Judgment as a Matter of Law

Defendants contend that their posttrial motion for judgment as a matter of law should have been granted because Piesco failed to prove that her testimony regarding the passing of functional illiterates was truthful and candid. Piesco, in addition to disputing this contention on its merits, argues that the posttrial motion was procedurally barred because it was not preceded by a proper motion for such relief prior to submission of the case to the jury. Preliminarily, we note that at various points, the parties have referred to defendants' motion prior to verdict as one for a "directed verdict" and to their posttrial motion as one for "judgment n.o.v." Both of these terms had been replaced in the 1991 amended version of Fed.R.Civ.P. 50, without substantive change, by the phrase "judgment as a matter of law." Use of the outdated terms, however, is merely a formal error, see 1991 Advisory Committee Note to amendment of Fed.R.Civ.P. 50, and whatever the terminology, we are inclined to agree with both Piesco's procedural challenge and the view that the posttrial motion had no merit.

### 1. Procedural Prerequisites

■ Rule 50 allows a defendant, after the close of the plaintiff's case, to move for judgment as a matter of law if, with respect to an issue essential to the plaintiff's case, there is no legally sufficient evidentiary basis for the

jury to find in favor of the plaintiff. Fed. R.Civ.P. 50(a). Such a motion must be made with specificity:

> (2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

Fed.R.Civ.P. 50(a)(2). A motion for judgment as a matter of law may also be made after judgment, but only if such a motion has also been made prior to submission of the case to the jury. Fed.R.Civ.P. 50(b). The purpose of requiring that a motion for judgment as a matter of law be made prior to the submission of the case to the jury "is to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment." 1991 Advisory Committee Note to amendment of Fed.R.Civ.P. 50.

■ The purpose of requiring that the moving party specify the basis for its preverdict motion for judgment as a matter of law is, similarly, "to give the claimant a fair 'opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.'" Smith v. Lightning Bolt Productions, 861 F.2d 363, 367 (2d Cir. 1988) (quoting 5A Moore's Federal Practice ¶ 50.08, at 50–77 (2d ed. 1988)). As the 1991 Advisory Committee Note states,

> [t]he second sentence of paragraph (a)(2) ... impose[s] a requirement that the moving party articulate the basis on which a judgment as a matter of law might be rendered. The articulation is necessary to achieve the purpose of the requirement that the motion be made before the case is submitted to the jury, so that the responding party may seek to correct any overlooked deficiencies in the proof.

1991 Advisory Committee Note to amendment of Fed.R.Civ.P. 50. The requisite articulation may be made by reference to materials and arguments previously supplied to the court, but only if the reference is "explicit." Id.

■ In the present case, defendants' motion for judgment as a matter of law before

submission of the case to the jury was anything but articulated. The entire relevant colloquy at the close of the evidence was as follows:

> JUDGE: I am sure [defense counsel] will want to say something at this point.
>
> COUNSEL: Yes, your Honor. Defendants move for a directed verdict.
>
> JUDGE: Denied.

This statement plainly did not identify the issue on which defendants contended there was insufficient evidence to permit the jury to find in favor of Piesco; nor was there an explicit reference to any of the prior proceedings such as to highlight the issue or issues as to which defendants believed insufficient evidence had been presented. Indeed, although, given the history of the prior summary judgment motion and the remand ordered by *Piesco II*, one might have expected the motion for "directed verdict" to be narrowly focused, the lack of specificity was apparently intentional: when this Court asked defendants' counsel, at the oral argument of this appeal, upon what issue the motion for judgment as a matter of law focused, the response was that defendants contended that Piesco had failed to prove any element of her case. When pressed to concede that they did not seriously contend that Piesco had failed to prove at least state action, defendants so conceded and then stated that Piesco had failed to offer any proof that she actually believed her committee testimony that No. 4061 could be passed by functional illiterates. Piesco, in response, called our attention to the following portion of her trial testimony:

> Q. At the Senate hearings in [*sic*] July 11, 1985, when you were asked your opinion and you gave your answer, did you truly believe that you were giving a truthful answer in response to the question as posed?
>
> A. Yes, I did.

Given that defendants (a) failed to specify any issue in their motion, (b) intended that motion to encompass all elements of Piesco's case, even those as to which there plainly was explicit evidence, and (c) even at the appellate stage have identified no other liability issue as to which they contended there

was no evidence, it would be difficult indeed to conclude that defendants' "directed verdict" motion gave plaintiff the adequate notice envisioned by Rule 50. In light of this record, we cannot conclude that defendants' motion for judgment as a matter of law prior to verdict was sufficiently informative to preserve their right to move for judgment as a matter of law after trial.

### 2. *The Merits*

In any event, the posttrial motion for judgment as a matter of law was properly denied, in part because of this Court's reversal of summary judgment in *Piesco II*, and in part because what remained to be decided after *Piesco II* were fact questions within the province of the jury.

 In the assessment of whether there are fact issues that should be decided only by the jury, the same standard that applies to a pretrial motion for summary judgment pursuant to Fed.R.Civ.P. 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (summary judgment standard "mirrors the standard for a directed verdict under [Rule 50(a) ]"); *Eastman Machine Co. v. United States,* 841 F.2d 469, 473 (2d Cir. 1988) (standards the same for summary judgment, directed verdict, and judgment n.o.v.); *see also* 1991 Advisory Committee Note to amendment of Fed.R.Civ.P. 50 (recent adoption of the term "judgment as a matter of law" to replace both the term "directed verdict" and the term "judgment n.o.v." was intended to call attention to the close relationship between Rules 50 and 56). Thus, when the court of appeals has remanded a case for retrial after ruling that judgment n.o.v. was properly denied, the district court cannot properly grant summary judgment on the basis of essentially the same evidence. *Wakefield v. Northern Telecom, Inc.,* 813 F.2d 535, 539–40 (2d Cir.1987). By the same token, when we have reversed the granting of summary judgment, the district court cannot properly grant judgment as a matter of

law on the basis of trial evidence that is not substantially different.

■■■ These principles outlined the procedural framework within which the substantive issues were to be considered after the remand by *Piesco II.* As to the substantive framework, as discussed in *Piesco II,* an employee who claims that her employment was terminated in violation of the First Amendment must establish first that her speech can be " 'fairly characterized as constituting speech on a matter of public concern,' " *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987) (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983)), and second that that speech was at least a substantial or motivating factor in the discharge, *see Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.1993), *petition for cert. filed,* 62 U.S.L.W. 3336 (U.S. Oct. 25, 1993) (No. 93–654); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1058 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993). The first element presents essentially a question of law, *Rankin v. McPherson,* 483 U.S. at 386 n. 9, 107 S.Ct. at 2898 n. 9; *Connick v. Myers,* 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7, and is to " 'be determined by the content, form, and context of a given statement, as revealed by the whole record.' " *Rankin v. McPherson,* 483 U.S. at 385, 107 S.Ct. at 2897 (quoting *Connick v. Myers,* 461 U.S. at 147–48, 103 S.Ct. at 1690). The second element, the employer's motivation, presents a question of fact. *Frank v. Relin,* 1 F.3d at 1329. If the plaintiff establishes both elements of her case, the employer may nonetheless escape liability if it can show that the employee's conduct interfered with its "effective and efficient fulfillment of its responsibilities to the public," and that that interference outweighs the employee's First Amendment rights. *Connick v. Myers,* 461 U.S. at 150, 103 S.Ct. at 1691–92. The employer's "burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Id.; see Frank v. Relin,* 1 F.3d at 1329.

In *Piesco II,* this Court (a) answered, to a great extent, the legal question posed by the first element, (b) expressed no view as to the factual question of employer motivation, and (c) noted that the evidence defendants had presented in support of summary judgment was insufficient to support their contention that Piesco's testimony to the Goodman Committee sufficiently disrupted DOP operations to permit them to fire her. As to the first element, we ruled that summary judgment was inappropriate on Piesco's First Amendment claim because her "right to give truthful answers before the Committee t[ook] precedence over the City's interest in efficiently performing government services." *Piesco II,* 933 F.2d at 1158. Thus, if the trial evidence established that Piesco's testimony to the committee was truthful, the district court was precluded from dismissing her First Amendment claim as a matter of law. As to defendants' efficiency defense, we indicated that since Piesco's statements so clearly touched on matters of public concern, defendants' burden was a heavy one and that the evidence presented by the defendants in support of their summary judgment motion did not meet their burden.

In the aftermath of *Piesco II,* there were thus three factual issues to be resolved with respect to liability. First was the question of whether, when Piesco was asked at the committee hearing whether she believed the pass mark for No. 4061 permitted passing by functional illiterates, her affirmative response reflected her actual belief. Second was the question of whether Piesco's committee testimony was at least a substantial or motivating factor in defendants' evaluations and their termination of her employment. Third was the question of whether Piesco's committee testimony significantly disrupted DOP operations.

The first two factual issues were submitted to the jury, which was instructed to determine first whether Piesco's testimony before the committee was truthful and responsive to the questions asked. The jury was instructed that if it found that that testimony was truthful and responsive, it must then determine whether that testimony got her fired. The jury found in favor of Piesco on both

issues. Given the standard for deciding a posttrial motion for judgment as a matter of law, a standard unchanged by the amendment to Rule 50, *see* 1991 Advisory Committee Note to amendment of Fed.R.Civ.P. 50, the district court could not properly overturn these findings.

■■■■ In ruling on such a motion in the first instance, or in reviewing its grant or denial on appeal, a court must "view the evidence in the light most favorable to the party against which the motion was made." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 361 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993); *Vasbinder v. Ambach,* 926 F.2d 1333, 1339–40 (2d Cir.1991); *Mattivi v. South African Marine Corp., "Huguenot",* 618 F.2d 163, 167 (2d Cir.1980). The court may conclude that the motion should be granted only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party. *Fugazy,* 983 F.2d at 361.

■■■ Defendants' contention that they were entitled to judgment as a matter of law because evidence presented at trial demonstrated that Piesco's testimony before the legislative committee was baseless and may have been intentionally false must be rejected. As indicated in Part II.A.1. above, Piesco testified at trial that she believed she was giving the committee an answer that was responsive and truthful. It was the responsibility of the jury, not the court, to determine whether her trial testimony should be believed. In order to grant defendants' motion, the district court would have been forced to disregard the standards governing such a motion and to draw inferences and make credibility assessments in favor of, rather than against, the moving party.

■■■ The third factual issue that remained after *Piesco II* related to defendants' claim that Piesco's testimony had disrupted DOP operations, permitting them to fire Piesco on the basis that the City's interest in efficient operations outweighed her First Amendment right to give truthful testimony to the Goodman Committee. The special verdict form submitted to the jury did not include a question as to the effect of Piesco's testimony on the efficiency of DOP operations. Since it does not appear that either party objected to this omission, that matter was left for resolution by the court. *See* Fed.R.Civ.P. 49(a); *Getty Petroleum Corp. v. Island Transportation Corp.,* 878 F.2d 650, 656 (2d Cir.1989). The district court noted that the evidence at trial was not substantially different from that presented in support of defendants' summary judgment motion. Accordingly, in light of the ruling in *Piesco II* that the latter evidence was insufficient to carry defendants' burden, the district court properly refused to grant defendants judgment after trial on the basis of their balancing defense.

In sum, the court properly denied defendants' motion for judgment as a matter of law.

### B. *The Motion for a New Trial*

Defendants' alternative motion for a new trial was based on their contention that the jury's findings were against the weight of the evidence. In ruling on this motion, the district judge stated that if he had been the factfinder he "clearly would have reached a different result," Posttrial Opinion at *2; however, he viewed this Court's then-recent decision in *Dunlap–McCuller v. Riese Organization,* 980 F.2d 153, 158 (2d Cir.1992) ("*Dunlap–McCuller*"), *cert. denied,* —— U.S. ——, 114 S.Ct. 290, 126 L.Ed.2d 239 (1993), as holding that such a motion could not be granted unless the jury's verdict could be characterized as "egregious," a standard that he felt was not met here:

If I were the factfinder, I clearly would have reached a different result. The uncontradicted facts on the record indicate that plaintiff was a difficult employee who went out of her way to antagonize those with whom she worked. It is hard to believe that any employee could reasonably expect to remain in her position for any substantial time after telling her immediate supervisor "I am fed up with your bullshit.... I don't have to do a fucking thing. Why don't you fire me?" Not sur-

prisingly, shortly after this incident, her supervisor, Mr. Ortiz, told Deputy Mayor Brezenoff that he wanted to fire Dr. Piesco, but Brezenoff said that action should be deferred until after the conclusion of the then-pending investigation by the Department of Investigation.

In addition, the evidence that plaintiff met secretly with the staff of the State Senate committee and lied about these meetings when she was subsequently questioned also suggests that she would not have remained in her position long even if her superiors fully respected her right to exercise her First Amendment freedoms. In addition, Judith Levitt testified that she would not have retained plaintiff in her position after Ms. Levitt succeeded. Ortiz as personnel director in February 1986.

Yet all of these facts were before the jury which apparently found that, but for her exercise of her First Amendment rights, plaintiff would have continued in the City's employ until her retirement and would have received regular pay increases during her remaining years as a City employee. Clearly, I believe this conclusion is wrong and appears to ignore the uncontradicted testimony of Judith Levitt that she would have fired Dr. Piesco for reasons unrelated to her State Senate testimony. Thus, I would be prepared to find that the jury's result was seriously erroneous which, according to the Second Circuit's decision in *Smith v. Lightning Bolt Productions,* 861 F.2d 363, 370 (2d Cir. 1988), could justify the grant of a new trial. More recently, however, the Second Circuit has cautioned that "the grant of a new trial on weight of the evidence should be reserve[d] for those occasions where the jury's verdict was *egregious.*" *Dunlap–McCuller v. The Riese Organization,* [980 F.2d at 158] (emphasis added). Because I do not believe the jury's verdict can be characterized as egregious, the motion for a new trial is denied.

Posttrial Opinion at *2.

■ Defendants contend that the court erred in applying an "egregious" standard, rather than the "seriously erroneous" standard, in ruling on their motion. Piesco con-

tends that a district court's denial of a motion for a new trial is not reviewable. Though there is support for the proposition that the denial of a new trial is unreviewable in some circumstances, *see generally Metromedia Co. v. Fugazy,* 983 F.2d at 363 (discussing authorities), such a decision is plainly reviewable to the extent that the challenge is that the district court applied the wrong legal standard, *see Fairmount Glass Works v. Cub Fork Coal Co.,* 287 U.S. 474, 482–83, 53 S.Ct. 252, 255, 77 L.Ed. 439 (1933) ("denial [of motion for new trial] may be reviewed if the trial court ... acted on the mistaken view that ... there was no authority to grant it on the ground advanced"). We agree with defendants that the court did not apply the proper standard.

In numerous cases prior to *Dunlap–McCuller,* this Court had described the power of the district court to grant a new trial based on the weight of the evidence as one that could properly be exercised only if the court viewed the jury's verdict as "seriously erroneous." *See, e.g., Smith v. Lightning Bolt Productions,* 861 F.2d at 370. This formulation was adopted in *Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir.1978), to standardize the conceptual framework within which such motions should be decided. In the ensuing years, the "seriously erroneous" formulation was used in at least a dozen cases, including several in the same year in which *Dunlap–McCuller* was decided, *see, e.g., Sorlucco v. New York City Police Department,* 971 F.2d 864, 875 (2d Cir.1992); *Hygh v. Jacobs,* 961 F.2d 359, 365 (2d Cir. 1992); *Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992); *Purnell v. Lord,* 952 F.2d 679, 686 (2d Cir.1992). In *Dunlap–McCuller,* a majority of the panel stated that "the grant of a new trial on weight of the evidence grounds should be reserved for those occasions where the jury's verdict was egregious." 980 F.2d at 158. For several reasons, we do not view this statement as having changed the legal landscape.

First, the *Dunlap–McCuller* statement was dictum. The panel had ruled that as to the contention that the district court erred in assessing the weight of the evidence, the

panel had no authority to review the grant of a new trial. Second, a panel of the Court lacks the authority to overrule the prevailing law of the Circuit. *See, e.g., Howe v. Commissioner,* 814 F.2d 98, 101 (2d Cir.), *cert. denied,* 484 U.S. 895, 108 S.Ct. 227, 98 L.Ed.2d 186 (1987). Third, there is no suggestion in either of the *Dunlap–McCuller* opinions that the panel believed a new standard was being established. The concurring opinion, for example, described the majority as "not[ing]" that a new trial should not be granted unless the verdict was egregious, *see* 980 F.2d at 160 (Walker, J., concurring), a description that treats the majority as recognizing an existing standard rather than adopting a new standard. Further, the majority opinion itself took explicit pains to follow the procedural law of this Circuit, stating, for example, "we are constrained by prior precedent in this Circuit, and consequently must hold that the district court's grant of a new trial is not reviewable," 980 F.2d at 157, and "[t]his panel is ... not empowered to overturn a longstanding precedent in this Circuit that has recently been reaffirmed by another panel," *id.* at 158. Given these statements, we think it inconceivable that the *Dunlap–McCuller* panel meant, sub silentio, to change the substantive standard that had been reaffirmed in four of our cases just months earlier.

■ In sum, the *Dunlap–McCuller* majority's obiter use of the word "egregious" was not meant to represent a change in circuit law. We construe its use of that term as an intended equivalent of "seriously erroneous," and we conclude that "seriously erroneous" remains the general standard that the district court should apply in ruling on a motion for a new trial on the ground that the jury's verdict is against the weight of the evidence, bearing in mind, as always, that

> [w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.

*Metromedia Co. v. Fugazy,* 983 F.2d at 363.

Accordingly, we reverse the order denying a new trial and remand for consideration under the proper standard.

## C. *The Challenge to the Damages Awards*

■ Finally, we note that defendants' contention that they were entitled to relief from the damages awards as a matter of law is meritless substantially for the reasons stated in the district court's Posttrial Opinion. Defendants' argument that punitive damages could not be awarded because "the overwhelming evidence" established that there was nothing retaliatory about their evaluations or firing of Piesco amounts simply to a challenge to the weight of the evidence, which, of course, is a matter for argument to the jury, not for reversal on appeal. It cannot be disputed that the City's own investigative arm, DOI, found that the August 1985 performance evaluations of Piesco had been

> improperly prepared by LaPorte and Ortiz so as to highlight criticism of [Piesco's] conduct. This treatment resulted, in part, from her testimony at the Goodman hearing.

(DOI Report at 1.) Further, Piesco's employment was terminated barely one week after she filed the present lawsuit complaining that the evaluations had been motivated by that testimony. Obviously there was sufficient evidence to permit the claim of retaliation to be submitted to the jury and to support its verdict.

## CONCLUSION

We have considered all of the parties' arguments on this appeal and, except as indicated above, have found them to be without merit. The judgment is vacated, and the matter is remanded for further proceedings not inconsistent with the foregoing.

No costs.