**THIS IS ME, INC., Plaintiff–Appellant,**

v.

**Elizabeth TAYLOR, Zev Bufman, and Zev Bufman Entertainment, Inc., Defendants–Appellees,**

No. 97–7150.

United States Court of Appeals, Second Circuit.

Argued Jan. 7, 1998.

Decided Sept. 30, 1998.

Kenneth J. Chesebro, Cambridge, MA (Robert C. Maland, P.A., Miami, FL, Richard L. Katz, Katz & Mestre, Coral Gables, FL, on the brief) for Plaintiff–Appellant.

Mark Abramowitz, New York City (Gilbert C. Hoover, IV, Parker Chapin Flattau & Klimpl, LLP on the brief) for Defendants–Appellees Zev Bufman and Zev Bufman Entertainment, Inc.

Ira G. Greenberg, New York City (Thomas E. Hone, Edwards & Angell on the brief) for Defendant–Appellee Elizabeth Taylor.

Before: JACOBS and LEVAL, Circuit Judges, and MISHLER, District Judge.[*]

JACOBS, Circuit Judge:

Actress Cicely Tyson, through her personal services corporation, plaintiff-appellant This Is Me, Inc., agreed to undertake the lead role in a Broadway production of "The Corn is Green" and in a contemplated taping of the production for television, and sues to recover unpaid fees for her services. Several contracts are arguably in issue; some are standard Actors' Equity (sometimes "Equity") form contracts, others are not; all are signed by and on behalf of various persons and entities as producers. At issue is the unpaid portion of a so-called "pay or play" guarantee of $750,000 payable if (as happened) the show closed before Tyson earned $750,000 in salary. Among the sufficiency of evidence issues are (i) whether the various contracts are sufficiently interrelated that they may be read together; (ii) whether the contractual phrase "a contract made in relation to the Play" includes a contract governing the videotaping; and (iii) who is bound in respect of the $750,000 pay or play guarantee.

Elizabeth Taylor, the actress, and Zev Bufman, the Broadway producer, formed a theater group to produce live performances of plays on the legitimate stage and video and television versions of the same plays. They chose "The Corn is Green" as their second production, and cast Cicely Tyson in the lead role. The play soon closed, and the video was never made.

This Is Me, the corporation through which Ms. Tyson provides her services, sued Taylor and Bufman (and Zev Bufman Entertainment, Inc.) under the pay or play guarantee. Plaintiff's arguments convinced the jury, which found Taylor and Bufman personally liable. The district court, however, issued judgment as a matter of law in favor of defendants on the grounds that the individual defendants were not signatories to the only contract that contained the guarantee, and that Tyson's arguments linking Taylor and Bufman to that undertaking are barred by the parol evidence rule.

We conclude that there was sufficient evidence from which the jury could find liability, and we therefore reverse. That evidence consists of the underlying and well-disclosed purpose of the enterprise to produce the play on stage as well as on videotape, the drafting history of the contracts, the contemporaneity of the undertakings, the cross-referencing between and among the contracts, and the background undertakings of the Actors' Equity rules, accepted by all the parties, that bind the individual signatories (as producers), as well as any partnership or venture controlled by them, to employment contracts.

## BACKGROUND

Following a prior collaboration as producer and actor, Zev Bufman and Elizabeth Taylor

---

[*] Honorable Jacob Mishler, of the United States District Court for the Eastern District of New York, sitting by designation.

decided to "put a theater group together" to produce plays on Broadway. They agreed generally that Bufman "would take care of the business end of it" and Taylor "would take care of the artistic end of it," specifically by "trying to get people to participate and become involved in the group."

Taylor and Bufman entered into a letter of intent providing that: (i) "[a]ll profits and losses will be shared equally between us;" (ii) the primary purpose of the Group was "the production of legitimate stage plays and television/film versions of such plays;" (iii) the Group would "produce three (3) plays each year;" (iv) it would be "of the essence at this time that we do not consider any play unless we are able to acquire or have an option to acquire the rights to televise such productions;" and (v) Taylor and Bufman would "be co-producers of every project" and would "each consult with the other with respect to all major decisions." Taylor testified that upon receiving the letter of intent, she scratched out the word "losses" on her copy before signing; she maintains that therefore she is not responsible for any losses. The letter of intent contemplated a more formal contract and the formation of a "new corporation" to carry out the venture, but neither eventuality came to pass.

For the Group's second project—a live production and videotape of Emlyn Williams's play, "The Corn is Green"—Bufman and Taylor decided to seek Cicely Tyson's services to star in the play. Taylor took the lead in recruiting Tyson, with whom she had worked before. In several phone calls and a lunch meeting, Taylor played a key role in reconciling creative differences between Tyson and the author of the play regarding whether use of the original screenplay would be appropriate. Throughout these discussions, Taylor referred to Bufman as her partner and noted that they were in this "50–50."

Tyson agreed to appear in the live theater production and the videotape production of "The Corn is Green," and exacted the $750,000 "pay or play" guarantee. The guarantee

reflected that Tyson, who was at the height of her career, would have to turn down other opportunities in film, television, and stage, and commit nearly a year to "The Corn Is Green."

An initial contract—later superseded—addressed all the undertakings concerning the stage and videotape performances of the play. This contract (hereinafter the "superseded contract") was dated December 9, 1982, and was executed by Cicely Tyson on behalf of This Is Me and by Zev Bufman on behalf of Zev Bufman Entertainment, Inc. Ms. Tyson also signed an inducement letter to bind herself personally, which is addressed to "Zev Bufman Entertainment, Inc. d/b/a The Elizabeth Theatre Group." [1] The obligations of the superseded contract were afterward bifurcated and expressed in two new contracts executed contemporaneously in August 1983, which provided that they were to be read together to constitute the entire agreement covering This Is Me's services in "The Corn is Green."

● The first of these contracts was a standard Actors' Equity document, a run of the play contract that guaranteed Tyson's weekly salary for the Broadway run, without guaranteeing the length of the run. The producer listed on this contract was an entity called "The Corn Company" and the individual signatory was Zev Bufman.

● The second of these contracts related to the video production, and contained the pay or play guarantee in the amount of the difference between $750,000 and salary paid under the run of the play contract (the "video contract"). This contract was between Zev Bufman Entertainment, Inc. and This Is Me.

Two further undertakings are potentially implicated as well, both of which arise from the efforts of Actors' Equity to protect its members from defaulting producers:

● It is conceded that the relationship between the actors and the producers in this production was governed by the Actors' Equity Association Agreement and Rules

---

1. Zev Bufman Entertainment, Inc. had registered to use "The Elizabeth Theatre Group" as a ficti-tious name under Florida law.

Governing Employment Under the Production Contract (the "Equity Agreement and Rules"). Bufman testified that "in order to put on a play in an Equity playhouse," he "had to abide by the collective bargaining agreement."

● The "Security Agreement" (also an industry standard agreement), signed by Zev Bufman, requires the producer to "promptly pay to the Actors any and all sums due," including sums due under employment agreements "made in relation to the Play," and defines "producer" broadly to "include[ ] the individual, firm, partnership or corporation *or any combination thereof* producing or controlling the production of said Play."

After out-of-town tryouts, "The Corn is Green" had a short run on Broadway, and its closing was unlamented by the critics. The video was never made, and Ms. Tyson received only the weekly salary payments made under the run of the play agreement.

Later, Tyson commenced an arbitration against Bufman, Taylor and Zev Bufman Entertainment, Inc. She won an award of $607,078.86 against Zev Bufman Entertainment, Inc., and at the behest of the individual defendants, agreed to permanently stay the arbitration as against Bufman and Taylor (preserving, however, the right of This Is Me to pursue claims against Bufman and Taylor in court).

The present action followed. The jury found that both Taylor and Bufman were liable to Tyson for "the unpaid balance of the $750,000 she was to receive for performing in the Corn Is Green," but the district court granted judgment as a matter of law dismissing the complaint on the grounds that (1) only the video agreement contained the pay or play guarantee; (2) that agreement unambiguously bound only Zev Bufman Entertainment, Inc.; and (3) the Security Agreement could not be "reasonably read to require anything more than the payments due under the Run-of-the Play[sic] Contract that it was designed to secure." This Is Me appealed; for the reasons that follow, we reverse.

## DISCUSSION

### I.

Federal Rule of Civil Procedure 50 provides that if a jury returns a verdict for which there is not a legally sufficient evidentiary basis, the district court may either order a new trial or direct the entry of judgment as a matter of law. Fed.R.Civ.P. 50(b). "[T]he same standard that applies to a pretrial motion for summary judgment pursuant to Fed.R.Civ.P. 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50." *Piesco v. Koch,* 12 F.3d 332, 341 (2d Cir.1993); *see also* Advisory Committee Note to 1991 Amendment of Fed.R.Civ.P. 50 (recent adoption of term "judgment as a matter of law" to replace both the term "directed verdict" and the term "judgment n.o.v." was intended to call attention to the close relationship between Rules 50 and 56). A district court may not grant a motion for a judgment as a matter of law unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Cruz v. Local Union No. 3, Int'l Bhd. of Elec. Workers,* 34 F.3d 1148, 1154–55 (2d Cir.1994) (quoting *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir. 1970)) (internal quotation marks omitted). Weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that "a reasonable juror would have been compelled to accept the view of the moving party." *Piesco,* 12 F.3d at 343.

We review a grant of judgment as a matter of law *de novo. See LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir. 1995); *Cruz,* 34 F.3d at 1155. "If, drawing all reasonable inferences in favor of the non-moving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor, we must overturn the ... judgment [as a matter of law]." *Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1039 (2d Cir.1992).

## II.

■ Under New York law, all writings forming part of a single transaction are to be read together. *See Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 263 (2d Cir.1965) ("[I]t is both good sense and good law that these closely integrated and nearly contemporaneous documents be construed together.") (internal quotation marks omitted) (quoting *Kurz v. United States*, 254 F.2d 811, 812 (2d Cir.1958) (*per curiam*)); *see also F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1258 (2d Cir.1987) (citing *Gordon* for the proposition that under New York law all writings forming a single transaction must be read together); *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197, 36 N.E.2d 106, 110 (1941) (finding that agreements at issue "were executed at substantially the same time, related to the same subject-matter, were contemporaneous writings and must be read together as one.").

The district court properly instructed the jury on this principle:

New York law requires that all writings which form part of a single transaction and are designed to effectuate the same purpose be read together, even though they were executed on different dates and were not all between the same parties. It is for you to determine whether the Actors' Equity run of the play contract, the Actors' Equity security agreement and the contractual obligation to pay This Is Me $750,-000 were each intended to be binding on all the same parties, and were intended to impose the same obligations on each of the parties, even though they were set forth in different documents.

We conclude that there was sufficient evidence—the drafting history and chronology, the cross-referencing of the agreements, the integral nature of the undertakings for the stage and video performance, the relationships among the producing parties and entities, and the background assumptions furnished by the Equity rules—for the jury, as properly instructed, to find that Taylor and Bufman were personally liable on the pay or play guarantee. That conclusion requires a further look at the terms of the various contracts, and their cross-referencing of each other.

### A. The Superseded Contract

The original contract for Tyson's services in the production, a letter agreement dated December 9, 1982 between This Is Me and Zev Bufman Entertainment, Inc., provided that Tyson would perform in the stage production and that a performance of that stage production would be videotaped. Zev Bufman Entertainment, Inc. undertook to pay salary for the run of the play, but not less than $750,000, installments of which would be paid at specified intervals "whether or not the Artist is actually performing":

We guaranty to "pay or play" to [This Is Me] for the services of [Tyson], the total sum of Seven Hundred Fifty Thousand ($750,000) Dollars plus Actors Equity Minimum Rehearsal Salary during the period of rehearsals....

This document also provided that the parties would enter into a standard Actors' Equity Association run of the play contract, but that the pay or play obligation would supersede the run of the play agreement "notwithstanding any provisions therein to the contrary."

This original agreement was split into two superseding agreements, one concerned with the stage performances and undertaking to pay weekly salary for the run of the play, the other concerned with the video performance and undertaking the pay or play guarantee. Conflicting evidence was offered to explain this drafting history, but the jury was free to credit testimony that the producers wanted to keep the pay or play guarantee out of the run of the play contract that would be filed with Actors' Equity in order to reduce the bond required under the Equity rules.

### B. The Run of the Play Contract

The run of the play contract was signed by Tyson on behalf of This Is Me and by Bufman on behalf of The Corn Company as "producer," a word left undefined by the contract, except that in Paragraph 9 the binding effect is said to reach the individual signatory as well as persons for whom the signatory acts:

Individual signature required. The Producer agrees that execution of this Contract binds not only the producing company, but the individual signator to this Contract as well as any person under whose authority this Contract is executed.

The jury could find that Zev Bufman was personally bound because he affixed his signature, and that Taylor was bound because Bufman acted on her authority.

The run of the play contract incorporates by reference the Actors' Equity agreement and rules, and recites that they are the essence of the contractual relationship between the parties, that they set forth the minimum conditions under which the actor may work for the producer, and that they may not be waived or modified without Equity's written consent. It is therefore significant that Paragraph 7 of the Equity rules extends the binding effect of contracts beyond their signatories:

All contracts of employment signed pursuant to these Rules are binding not only upon the signers on the face thereof, but upon any and all corporations, co-partnerships, enterprises and/or groups which said signers or each of them directs, controls, or is interested in, and are hereby agreed to be adopted as their contract by each of them.

By virtue of that clause, the run of the play contract is unquestionably binding upon Taylor and Bufman as producers, but that fact is of limited import, because the pay or play guarantee that this suit seeks to enforce does not appear in the run of the play contract. For reasons stated later in this opinion, however, there was sufficient evidence from which the jury could find that the video agreement, which contains the pay or play guarantee, cross-references the run of the play contract, which in turn incorporates the Equity rules. The interlocking nature of the agreements and the Equity rules is further confirmed by the fact that the Equity agreement and rules prohibit the videotaping of any production in which members of Equity are employed without the express permission of Equity and without adhering to the terms and conditions established by Equity.

### C. The Video Contract

The video contract, signed on behalf of Zev Bufman Entertainment, Inc., guarantees payment to This Is Me of the difference between $750,000 and the salary paid pursuant to the run of the play contract. The contract recites that it constitutes the parties' "full and binding agreement with respect to ... our proposed film and/or video recording of 'The Corn is Green,'" and that it is "intended to be executed concurrently with a 'Run of the Play' Actors Equity Association contract with respect to the Artist's services in a live stage production of the play."

### D. Actors' Equity Security Agreement

The standard form Security Agreement, entered into between Actors' Equity Association and The Corn Company (Zev Bufman as signatory), provides for the posting of security and undertakes in other ways as well to ensure that actors receive payment for their services. "The subject of th[e] agreement" is the "Play," a defined term that in this instance "is the theatrical production known as 'THE CORN IS GREEN.'" The Security Agreement requires that the "producer" pay the actor all sums due under any "individual employment agreement," independent of the obligation to deposit security.

That provision is reinforced and broadened elsewhere in the agreement by language that extends the payment guarantee to other employment contracts made with the actors "in connection with said Play" or "in relation to the Play," and imposes the payment obligation on the signatory as well as the entity named as producer, and also on any partnership or other entity that is party to an individual employment agreement. Thus Paragraph 8 provides:

All Individual Employment Contracts and collective bargaining agreements heretofore entered into, or which may hereafter be entered into, *in connection with said Play* are hereby made subject to all terms and conditions herein; all of which are agreed to be material and of the essence of the said Individual Employment Agreements, and as amended by these provisions, all such present and future employ-

ment contracts shall be and remain in full force and effect.

(Emphasis added.) Paragraph 15 provides:

Individual Signature Required. The Producer and Guarantor each severally agree that his signature on this agreement, if in a representative capacity, is *also an individual signature binding him individually to this agreement.* This provision is of the essence of this contract.

(Emphasis added.) Two definitions broaden the reach of the agreement:

"Producer" includes the individual, *firm, partnership, or corporation, or any combination thereof, producing or controlling the production of said Play who has entered into an Individual Employment Agreement* or who may hereafter enter into an Individual Employment Agreement with any of said Actors.

"Individual Employment Agreement" means any agreement of employment heretofore or hereafter *entered into between an Actor and The Guarantor or Producer in relation to the Play.*

(Emphasis added.)

## III.

Although as finders of fact we might have read the contracts as Judge Martin did, we do not believe this reading is the only one permitted by the evidence. Considering all the circumstances, we believe that (A) the several agreements should be read together, and that (B), when they are so read in the light of all the evidence, they are capable of sustaining the jury's conclusion that Bufman and Taylor were bound by the $750,000 guarantee set forth in the video contract.

### A

█ The various agreements in this case all relate to a single transaction: Ms. Tyson's services as an actor in the production of "The Corn is Green." The videotaped and live performances were components of a single project, as defendants Bufman and Taylor intended from the outset: the letter of intent forming the Elizabeth Theatre Group indicated that it was of the essence of the venture to obtain video and/or television rights to

each play that it intended to produce. The agreements with Tyson—the run of the play contract and the video contract—were executed more or less concurrently, and the video contract expressly states that the two contracts were intended to be executed together. The lawyer for Zev Bufman Entertainment, Inc. conceded in a letter that the run of the play contract and the video contract were intended to be read together to define the parties' relationship. The jury was justified under New York law in reading the contracts together, in light of the other evidence.

### B

█ When the contracts are read together in light of the other evidence, there are two entirely sufficient analyses that can support the jury verdict against Taylor and Bufman.

First, the video contract (which contains the $750,000 guarantee) cross-references the run of the play contract, which in turn expressly incorporates the Actors' Equity rules. And the run of the play contract, which does not say that it constitutes the parties' full and binding agreement, can be read to incorporate the video contract without contradicting its own express terms. Paragraph 9 of the run of the play contract provides that an individual who signs it in a representative capacity is also bound, and Paragraph 7 of the Equity rules extends the binding power of any employment agreement still further to any partnership or enterprise directed by the signatory. Thus the jury could have concluded that Zev Bufman's signature on the video contract on behalf of Zev Bufman Entertainment, Inc. also bound: (i) himself and (ii) the Elizabeth Theatre Group, an enterprise in which he was a partner. The jury could then further have assessed individual liability against Taylor as derivative of the Elizabeth Theatre Group's liability, because there was evidence (including Taylor's own statements to Tyson) from which the jury could conclude that Ms. Taylor was a partner in the Elizabeth Theatre Group.

Alternatively, the jury could have relied on the Security Agreement (read in conjunction with the run of the play contract and video contract). The Security Agreement provides

that it applies to all "individual employment contracts," and defines such contracts as "any agreement of employment heretofore or hereafter entered into between an Actor and the Guarantor or Producer in relation to the Play." The pertinent inquiry under this theory is whether evidence was presented from which the jury reasonably could conclude: (i) that the video contract, in addition to the run of the play contract, was an agreement "in relation to the Play;" and (ii) that Taylor and Bufman fit the definition of producers.

Sufficient evidence existed to support a jury verdict on this theory:

● The video contract was part of what had originally been a single contract that indisputably was made "in relation to the Play."

● The stage performance and the video of it were always regarded as integral components of one project; it was for this reason that Taylor and Bufman provided that an essential term of their agreement to form a production company was that the company obtain video and television rights to the plays they intended to produce.

● Tyson's compensation under the video contract was related to her compensation for the live production: the longer the run, the more she collected in salary, the less she would be paid via the guarantee for the video, and of course if her salary payments reached $750,000, she would be paid nothing more for the video performance.

● The subject of the proposed video is undoubtedly the live production of the play.

● The Equity rules prohibit the filming of a production in which Equity members are employed without Equity's permission and provide that Equity's terms and conditions apply, from which the jury could have inferred that Equity is interested in securing payment to its members for video versions of live performances as well as the performances themselves.

The jury also heard evidence from which it reasonably might have concluded that both Elizabeth Taylor and Zev Bufman were producers of "The Corn is Green." The production ran on Broadway under a marquee that announced "Elizabeth Taylor and Zev Bufman present...." The letter of intent forming the Elizabeth Theatre Group provides that Bufman and Taylor would be co-producers of every project. And Taylor and Bufman are identified as co-producers in the advertisements for the play, the *Playbill*, and the letterhead used for the production.

For these reasons, the jury was free to find that Bufman and Taylor were producers, and that the video contract was an employment agreement made in relation to the play. The district court's view—that only the run of the play contract is a contract "in relation to the Play"—may be fairer, and better supported by evidence; but that is not for us to say. As long as there is some evidence based upon which the jury could have held Zev Bufman and Elizabeth Taylor individually liable, we must reinstate the verdict.

### IV.

Taylor and Bufman belatedly contend that Tyson should be relegated to the Equity grievance procedures and that her failure to exhaust those procedures bars her from reliance on the Equity contracts. Defendants waited far too long to raise this as a defense; moreover, Ms. Tyson did initiate arbitration against these defendants but stipulated to a permanent stay of the arbitration (reserving to This Is Me the right to pursue claims against Ms. Taylor and Mr. Bufman) when they suggested she seek execution of the award she had already received against the corporate defendant (a company that Bufman, at least, knew lacked assets to satisfy the judgment).

### CONCLUSION

The judgment of the district court is reversed, and the jury's verdict reinstated.