**SEABURY CONSTRUCTION CORPORATION, Plaintiff–Appellant,**

**v.**

**JEFFREY CHAIN CORPORATION, Defendant–Appellee.**

**Docket No. 01–7620.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 7, 2002.

Decided: April 22, 2002.

Kalvin Kamien, Max E. Greenberg, Trager, Toplitz & Herbst, New York, NY, for Plaintiff–Appellant.

Stephen G. Anderson, Baker, Donelson, Bearman & Caldwell, Knoxville, TN (Wendy E. Long, Kirkland & Ellis, New York, NY, on the brief), for Defendant–Appellee.

Eric Proshansky, Office of the Corporation Counsel of the City of New York, New York, N.Y. (Michael D. Hess, Corporation Counsel of the City of New York; Stephen J. McGrath, on the brief), for Amicus Curiae the City of New York.

Before: SACK, KATZMANN, and B.D. PARKER, Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

Plaintiff Appellant Seabury Construction Corporation ("Seabury") appeals from a judgment of the United States District Court for the Southern District of New York (Michael B. Mukasey, *Judge*), entered May 8, 2001. Seabury sued Defendant Appellee Jeffrey Chain Corporation ("Jeffrey"), claiming breach of contract arising from failures in industrial collector chain. The chain was manufactured by Jeffrey and sold to Seabury for installation at the Hunts Point Water Pollution Control Plant in the Bronx, New York, which was under renovation by the New York City Department of Environmental Protection (the "DEP").

Following a bench trial, the District Court found that the chain failed because some of the links had been manufactured to hardness levels that exceeded contract specifications and that these failures occurred while the chain was under warranty. However, the lower court dismissed Seabury's Complaint because it concluded that Jeffrey's compliance with a required testing protocol trumped otherwise applicable contract specifications. Because we

do not believe that the protocol overrode either the hardness requirements or performance assurances contained in the contract, we reverse and remand for a determination of damages.

## BACKGROUND

In April 1995, the DEP entered into a $7,710,000 contract with Seabury to reconstruct twenty-seven water treatment tanks located at the Hunts Point Plant. The DEP contract with Seabury consisted of Seabury's bid, the Information for Bidders and Standard City Agreement, and the City's General Conditions and Detailed Specifications. The tanks in question facilitate wastewater treatment by allowing the water to settle, at which point it is skimmed to remove waste product. The skimming equipment consists of collector and drive chains, which resemble large bicycle chains, assembled into arrays that are continually passed through the tanks to remove solid waste materials. In order for chain to survive in a highly corrosive wastewater environment, it must be manufactured to precise contract specifications, including those related to the hardness of the links.

Seabury's contract permitted it to subcontract with Jeffrey, Hitachi Metal Limited, or another comparable supplier for production of the necessary chain. Following negotiations, Jeffrey and Seabury executed a Purchase Order dated April 19, 1995. As set forth in the Purchase Order, Jeffrey agreed to provide 58,194.3 feet of steel chain and other related equipment required by the Seabury/DEP contract for a purchase price of $910,000. The Purchase Order provided, among other things, that "[a]ll equipment shall be acceptable to the City of New York, Department of Environmental Protection, and they [sic] shall be the sole judge of acceptability, and any replacement shall be at Jeffrey Chain Corp.['s] expense. Any inspection and/or testing shall be at Jeffrey Chain Corp.['s] expense." The Purchase Order created a three-year warranty on the drive chain and a one-year warranty on the collector chain "as per the New York City requirements," which mandated that the contractor "promptly repair, replace, restore or rebuild, as the Commissioner [of the DEP] may determine, any finished work in which defects of materials or workmanship may appear or to which damage may occur because of such defects, during the one year period subsequent to the date of final acceptance except where other periods of maintenance and guarantee are provided for." The purchase order further required that "[r]eplacement of problem or failed chain is at the description [discretion] of Seabury/N.Y.C. D.E.P. with input from Jeffrey." Finally, the Purchase Order provided that "[a]ll aspects of the N.Y.C. D.E.P. standard contract specifications and drawings are hereby made a part of this purchase order most notably sections D–2, B–2.1B, B–1, B–5, B–6, B–7, B–8, B–9, [and] H."

Jeffrey manufactured the chain in the fall of 1995 at its Morristown, Tennessee plant. Section B–9 of the Seabury/DEP Detailed Specifications, which was incorporated into the Purchase Order, required Jeffrey to test samples of each day's production for, among other things, strength and hardness, and, prior to delivery, to conduct additional tests that could be witnessed by the DEP. The provision also required Jeffrey to perform the latter set of tests "in a manner which shall conclusively prove that the characteristics of the material or equipment subject to test comply fully with the requirements of the specifications." DEP representatives observed the ultimate testing, and Jeffrey determined that the chain passed all of the required tests and forwarded appropriate

certifications to Seabury. The DEP subsequently approved the chain for delivery, and the chain was delivered in December 1995 and installed between March 1996 and September 1997.

Following installation, extensive chain failures occurred in the side bars of the collector chain. The first failure occurred in June 1997, when a chain shattered after nine months in operation. Subsequently, chain failed in a number of other tanks, with some tanks experiencing multiple failures. These failures were in marked contrast to the performance of chain in other tanks at Hunts Point manufactured by Hitachi to the same specifications, which had been in use since 1993 without significant failures.

Jeffrey, Seabury, and the DEP all attempted to determine the cause of the failures. In August 1997, the DEP sent samples of broken chain to an independent metallurgist, Lucius Pitkin, Inc. ("LPI"). LPI concluded that the failures were caused by "stress corrosion cracking." Stress corrosion cracking occurs when chain is made too hard, thereby compromising its structural integrity. Section B–5(c) of the Detailed Specifications, which was incorporated into the Purchase Order, required that, prior to installation, the side bars of the collector chain be "heat treated to 90–105 Rockwell B," a scale measuring the hardness of steel.[1] LPI concluded that the chain failed because some links had been manufactured to a hardness level that exceeded contract specifications. Specifically, LPI found that "[t]he root cause of the chain failure is attributable to the high hardness, well in excess of that specified [by section B–5(c) ], for the Type 403 martensitic stainless steel side bar material comprising the chain."

Jeffrey performed its own analysis on samples of the broken chain in July 1997 and found that the failed chain ranged in hardness from 100 to 113 Rockwell B, generally exceeding contract specifications. In November 1997, Jeffrey conducted tests on more of the failed links. These tests further confirmed that the failures were caused by stress corrosion cracking and that the additional failed links ranged in hardness from 100 to 113 Rockwell B. Finally, in April 1999, Seabury retained its own metallurgical expert who also found that the average hardness of the failed chain exceeded section B–5(c)'s specifications.

Seabury claims that, to fulfill its contractual obligations to the DEP, it spent over $175,000 repairing and replacing failed chain. After Jeffrey refused to reimburse it for these expenditures, Seabury sued Jeffrey in diversity for breach of contract, seeking to recover the cost of repairing and replacing the defective chain. The case proceeded to trial in December 2000.

Seabury submitted extensive evidence of the chain failures, for which Jeffrey presented the court with two explanations. First, Jeffrey claimed that the DEP's own specifications called for chain that was too hard to withstand the corrosive effects of the wastewater. In support of this contention, Jeffrey demonstrated that, subsequent to the Hunts Point failures, the DEP lowered the maximum hardness for collector chain to 95 Rockwell B and discontinued the use of metallic chain. The court rejected this argument, finding that chain manufactured by Hitachi to the same hardness specification had performed satisfactorily for many years. Jeffrey's second defense was that the chain failures

---

1. In its entirety, section B–5(c) reads: "The steel side bars shall be 15/64″ × 1 57/64″ type 403 stainless steel, heat treated to 90–105 Rockwell B. The width between inside bars shall be 1 3/16″."

were caused by Seabury's deliberately improper installation of the chain. The court also rejected this theory, finding that there was "absolutely no evidence" to support it. Instead, the District Court credited Seabury's argument that the links failed because they were manufactured to a hardness level beyond that specified in the Purchase Order. The court found that this theory "had substantial support in the record, including the testimony of two independent metallurgists...." (Hearing Tr., Apr. 4, 2001, at 14 [hereinafter Tr.].) Further, the District Court found that "[t]he record shows that the chain in question failed in many tanks within a year of installation," the applicable warranty period. (Tr. at 12.) Specifically, the court found that Seabury had established chain failures in all or a portion of 37 separate tanks and that 23 of the failures occurred within one year of installation. (Tr. at 12.)

Notwithstanding the conclusion that manufacturing defects caused numerous failures within the warranty period, the court below dismissed Seabury's Complaint, finding that "there has been a failure of proof here because plaintiff has not shown that the chain failed the test for acceptability set forth in [section B–9(c)]." (Tr. at 15.) The court found that "due to an odd feature of the test protocol set forth in the contract, which allowed the chain to be accepted for use even though some of it might not have met contract specifications, plaintiff has failed to prove that the chain in question did not comply with the contract requirements." (Tr. at 3.)

The test protocol at issue, section B–9(c) of the Detailed Specifications provides as follows:

> Certified hardness and strength records of each day's production of the chain shall be available for study by the authorized representative of the [DEP]. If the data in these records meet the specifications, then strength and hardness tests of three test[ ] chains shall be considered adequate for all collector chain and all drive chain manufactured. Should any of the three test chains fail to comply with the specifications, six additional samples shall be tested. Should any of the additional test strands fail to comply with the specifications that specific lot of chain shall be rejected. If the daily hardness records do not indicate compliance with the specifications, sufficient strength and hardness tests shall be performed to the satisfaction of the Engineer. The remainder of the tests on all collector chain and drive chain shall be performed on three pairs of chains (six chains), each 10 feet long. Should any of these test chains not comply with one or more of the specifications, six additional samples shall be tested for such specifications. Should any of the additional samples not comply, that specific lot of chain shall be rejected.

The District Court interpreted this protocol to mean that, even where a sample of the chain failed to meet the hardness requirements, the lot was still acceptable so long as six additional samples were within the specification. (Tr. at 3.) Based upon this determination, the court concluded that section B–9(c) was not intended to screen out all chain that ultimately would not perform. Rather, the court interpreted this provision to permit the production and acceptance of out-of-specification chain, so long as it had passed the prescribed tests. Because the evidence indicated that Jeffrey complied with section B–9(c)'s testing protocol, the court entered judgment for Jeffrey, and Seabury appealed.

## DISCUSSION

[1, 2] "We review a district court's interpretation of a contract *de novo.*" *Lee v.*

*Bsb Greenwich Mortgage Ltd. P'ship*, 267 F.3d 172, 178 (2d Cir.2001). Here, our analysis is governed by New York law relating to contract interpretation. Where the contract is unambiguous, courts must effectuate its plain language. *See Slamow v. Del Col*, 79 N.Y.2d 1016, 584 N.Y.S.2d 424, 594 N.E.2d 918, 919 (1992) (stating that "[t]he best evidence of what parties to a written agreement intend is what they say in their writing"); *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 498 N.Y.S.2d 344, 489 N.E.2d 231, 233 (1986) (noting that the meaning of an unambiguous provision should "be gleaned from the face of the instrument") (citation and internal quotation marks omitted); *see also Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir.2000) (stating that a contract governed by New York law "is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract") (citation and internal quotation marks omitted). Accordingly, we begin by analyzing the relevant contract provisions.

■ The District Court found that section B–9(c)'s testing protocol overrode the express hardness requirements set forth in section B–5(c). Section B–5(c) provides that the steel side bars "shall be" heat treated to 90–105 Rockwell B. This choice of language suggests a mandatory course of action. *See United States v. Maria*, 186 F.3d 65, 70 (2d Cir.1999) (stating that "the word 'shall' is 'used to express a command or exhortation,' and is 'used in laws, regulations, or directives to express what is mandatory'") (citation omitted). By employing the word "shall," section B–5(c) indicates that the hardness requirements are mandatory.

Moreover, nothing in the text of section B–9 generally or section B–9(c) specifically indicates that the testing provision established the exclusive criteria for acceptability. The protocol only required that specified samples of the chain be tested, and there is no indication that, if these samples passed, the DEP could not later reject defective, out-of-specification chain. In fact, section B–9(a) places the burden on the supplier to perform all tests, including the strength and hardness tests set forth in section B–9(c), "in a manner which shall conclusively prove that the characteristics of the material or equipment subject to test [sic] comply fully with the requirements of the specifications."[2] The lower court's reliance on section B–9(c) to the exclusion of the rest of the Purchase Order places more weight on the testing provision than the parties intended it to bear.

2. Section B–9(a), which sets forth the general testing requirements, states in full that:

The witness tests specified under this item and hereinafter shall be performed in the shop of the maker in a manner which shall conclusively prove that the characteristics of the material or equipment subject to test comply fully with the requirements of the specifications. Tests on metallic chain shall be conducted in accordance with the test codes of the A.S.M.E. and the requirements of these specifications. The cost of testing shall be borne by the Contractor and shall be deemed to be included in the contract price. The Contractor shall give the Engineer written notice ten days in advance of the time when the equipment will be ready for the witness shop tests. This notification shall include a diagram of the testing set up and a list of the instruments the manufacturer proposes to use for the tests. All instruments shall be of ranges suitable for the quantities to be measured, with approved laboratory calibration. Six copies of witness shop test data and interpreted results thereof accompanied by a certificate of authenticity, sworn to by a responsible official of the manufacturing company, shall be forwarded to the Engineer for approval. The cost of travel of the Engineer or his representative to the testing site will be borne by the Contractor.

An examination of the entire Purchase Order further confirms that the District Court relied too heavily upon section B–9(c). *See Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 100 (2d Cir.1997) (stating that "well-established principles of contract interpretation ... require that all provisions of a contract be read together as a harmonious whole"); *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990) (noting that a contract should be "read as a whole to determine its purpose and intent"); Restatement (Second) of Contracts § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together."). The language used throughout the Purchase Order demonstrates that Seabury was not just buying chain that passed sample testing at Jeffrey's facility—it was buying chain that fully complied with all relevant specifications.

First, the Purchase Order provides that "[a]ll [chain] shall be acceptable to the City of New York, Department of Environmental Protection, and they [sic] shall be the sole judge of acceptability, and any replacement shall be at Jeffrey Chain Corp.['s] expense." This provision is at odds with a conclusion that the testing of chain samples alone determines acceptability, since it expresses a contractual understanding that the DEP retained ultimate discretion to decide whether any of the chain was defective. More important, the fact that this clause requires the replacement of defective chain indicates that the DEP was free to reject chain even after it had passed applicable tests and had been accepted for installation. Because there is no exception for chain that passed the testing protocol, the District Court's interpretation of the Purchase Order denies Seabury the benefit of this provision.

Next, the Purchase Order provides that "[r]eplacement of problem or failed chain is at the description [discretion] of Seabury/ N.Y.C. D.E.P. with input from Jeffrey." This clause contemplates that chain that satisfied the testing protocol could still be found unacceptable by Seabury or the DEP after installation. The District Court's interpretation of the agreement directly conflicts with this term.

Finally, the Purchase Order contains a "one year warranty on collector chain as per the New York City requirements (including labor to remove and replace any failed chain while Seabury is on site/or has a warranty with the [DEP] )." The "New York City requirements" mandate that the Contractor "promptly repair, replace, restore or rebuild, as the Commissioner [of the DEP] may determine, any finished work in which defects of materials or workmanship may appear or to which damage may occur because of such defects, during the one year period subsequent to the date of final acceptance...." The warranty provides no exception for chain that fails because it was hardened beyond the level specified in the Purchase Order even though it had been successfully tested by Jeffrey prior to delivery. Thus, the warranty imposed on Jeffrey the obligation to repair or replace any defective chain that failed within the warranty period.

 General canons of contract construction require that "where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect." *Proyecfin de Venezuela, S.A. v. Banco Indus. de Venezuela, S.A.*, 760 F.2d 390, 395–96 (2d Cir.1985) (citation omitted). "This [doctrine] applies with equal force where two documents are contemporaneous and related or where one incorporates the terms of the other." *Id.* at 396. Under the theory adopted by the court below, full

compliance with section B–9(c) would virtually eliminate the protections afforded by the warranty whenever chain failed as a result of improper hardness. Accordingly, we conclude that the Purchase Order does not permit compliance with section B–9(c) to relieve Jeffrey of its obligation to supply chain that conforms to applicable strength and hardness specifications.

While the Purchase Order alone is dispositive, numerous provisions of the Seabury/DEP contract reinforce this conclusion. Sections B–5(c) and B–9(c) of the Purchase Order were drawn from the Seabury/DEP contract's Detailed Specifications. As previously noted, the Seabury/DEP contract consists of Seabury's bid, the Information for Bidders and Standard City Agreement, and the City's General Conditions and Detailed Specifications. The Purchase Order incorporated, somewhat inartfully, "[a]ll aspects of the N.Y.C. D.E.P. standard contract specifications and drawings. . . ." Although neither this language nor the record make clear which of the documents apart from the Detailed Specifications were actually incorporated into the Purchase Order, a number of provisions from the Information for Bidders and Standard City Agreement and the General Conditions would preclude the possibility that Seabury and the DEP intended for section B–9(c) to have the effect attributed to it by the District Court. Most notably, Article 6a of the Information for Bidders and Standard City Agreement provides that:

> Inspection and approval by the Commissioner, the Engineer, or Resident Engineer, . . . of materials and equipment at the place of manufacture or preparation, shall not relieve the Contractor of his obligation to perform the work in strict accordance with the Contract. Finished or unfinished work found not to be in strict accordance with the Contract shall be replaced as directed by the Engineer,

even though such work may have been previously approved and paid for.

This provision is inconsistent with a conclusion that the testing and inspection provisions negate the other contractual specifications. Further, Article 33(1) of the same document provides that:

> [T]he [DEP] . . ., shall [not] be . . . precluded or estopped by any determination, decision, [or] . . . approval, . . . made or given under or in connection with this Contract by the [DEP] . . . either before or after the final completion and acceptance of the work and payment therefor . . . [f]rom showing the true and correct . . . quality or character of the work actually done . . . or that the work or any part thereof does not in fact conform to the requirements of this Contract. . . .

This language indicates that acceptance of the chain following the testing protocol does not waive the otherwise applicable contract specifications. Finally, Item G–0.31 of the City's General Conditions stipulates that:

> If at *any* time prior to expiration of guarantee an inspection, test or analysis of work reveals faulty design, inferior or defective materials, poor workmanship, improper installation, excessive wear or nonconformity with the requirements of the contract documents, such work will be rejected and shall be replaced with satisfactory work at the Contractor's expense.

(Emphasis added). These provisions make clear that, during the one-year warranty period, the DEP could conduct further testing and could require replacement of any chain that the tests revealed was not in conformity with applicable specifications. None of these three clauses makes an exception for chain that passed the tests for hardness and strength set forth

in section B–9(c). If the language, "[a]ll aspects of the N.Y.C. D.E.P. standard contract specifications and drawings" includes these provisions among those incorporated into the Purchase Order, these terms further illustrate that section B–9(c) does not override the Purchase Order's hardness requirements or performance assurances.

## CONCLUSION

Because the District Court's interpretation of the testing protocol in section B–9(c) is contrary to the plain language of the Purchase Order, we conclude that section B–9(c) does not override Seabury and the DEP's right to reject chain that does not meet contractual hardness specifications and to require Jeffrey to bear the costs of repair or replacement. Joining these conclusions with the District Court's findings that the chain failures were caused by excessive hardness and that many of the failures were covered by Jeffrey's warranty, we conclude that Seabury has proven that Jeffrey breached the terms of the Purchase Order. Accordingly, we reverse and remand with instructions to enter judgment in favor of Seabury and to determine appropriate damages.