**IN RE: CAESARS ENTERTAINMENT OPERATING CO., INC., et al., Debtors.**

## No. 15 B 1145

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Signed May 18, 2016

Attorneys for debtors Caesars Entertainment Operating Co., Inc., et al.: James H.M. Sprayregen, P.C., David J. Zott, P.C., David R. Seligman, P.C., Jeffrey J. Zeiger, P.C., Kirkland & Ellis LLP, Chicago, IL; Paul M. Basta, P.C., Nicole L. Greenblatt, Kirkland & Ellis LLP, New York, NY

Attorneys for Official Committee of Second Priority Noteholders: Timothy W. Hoffmann, Jones Day, Chicago, IL; Bruce Bennett, James O. Johnston, Sidney P. Levinson, Joshua M. Mester, Jones Day, Los Angeles, CA

Attorneys for Statutory Unsecured Claimholders' Committee: Mark K. Thomas, Jeff J. Marwil, Paul V. Possinger, Brandon W. Levitan, Proskauer Rose LLP, Chicago, IL; Martin J. Bienenstock, Judy G.Z. Liu, Philip M. Abelson, Vincent Indelicato, Proskauer Rose LLP, New York, NY

Attorneys for Wilmington Trust, N.A.: Eric N. Macey, Stephen J. Siegel, Julie Johnston–Ahlen, Novack and Macey LLP, Chicago, IL; J. Christopher Shore, Harrison L. Denman, White & Case LLP, New York, NY; Thomas E. Lauria, Jason Zakia, White & Case LLP, Miami, FL; Seth H. Lieberman, Patrick Sibley, Pryor Cashman LLP, New York, NY

Attorneys for Delaware Trust Company, FSB: Eric Prezant, Bryan Cave LLP, Chicago, IL; Stephanie Wickouski, Bryan Cave LLP, New York, NY

Attorneys for BOKF, N.A.: Mark F. Hebbeln, Harold L. Kaplan, Foley and Lardner LLP, Chicago, IL; Andrew I. Silfen, Mark B. Joachim, Michael S. Cryan, Arent Fox LLP, New York, NY; Jackson D. Toof, Arent Fox LLP, Washington, DC

Attorneys for Wilmington Savings Fund Society, FSB: Timothy W. Hoffmann, Jones Day, Chicago, IL; Bruce Bennett, James O. Johnston, Sidney P. Levinson, Joshua M. Mester, Jones Day, Los Angeles, CA; Mark W. Page, Kelley Drye & Warren LLP, Chicago, IL; Eric R. Wilson, David I. Zalman, Kristin S. Elliott, Kelley Drye & Warren LLP, New York, NY

Attorneys for Ad Hoc Committee of First Lien Noteholders: Mark A. Berkoff,

Robert Radasevich, Nicholas M. Miller, Neal, Gerber & Eisenberg LLP, Chicago, IL; Kenneth H. Eckstein, P. Bradley O'Neill, Douglas H. Mannal, Daniel M. Eggermann, David E. Blabey, Jr., Kramer Levin Naftalis & Frankel LLP, New York, NY

Attorneys for UMB Bank, N.A.: Peter A. Siddiqui, Katten Muchin Rosenman LLP, Chicago, IL; Craig A. Barbarosh, David A. Crichlow, Karen B. Dine, Katten Muchin Rosenman LLP, New York, NY

Attorneys for Ad Hoc Committee of First Lien Bank Lenders: Brian L. Shaw, Shaw Fishman Glantz & Towbin LLC, Chicago, IL; Kristopher M. Hansen, Kenneth Pasquale, Erez E. Gilad, Jonathan D. Canfield, Stroock & Stroock & Lavan LLP, New York, NY; Ariel N. Lavinbuk, Lanora C. Pettit, Robbins, Russell, Englert, Orseck, Untereiner & Sauber, Washington, DC

## MEMORANDUM OPINION

A. Benjamin Goldgar, United States Bankruptcy Judge

These jointly-administered chapter 11 cases are before the court for ruling after an evidentiary hearing on the objections of Wilmington Trust, N.A., as successor indenture trustee for the 10.75% senior unsecured notes ("Wilmington"), to two proofs of claim, both filed by first lien parties. One is the claim of Credit Suisse AG, Cayman Islands Branch, as agent on behalf of first lien lenders (the "First Lien Bank Lenders"); the other is the claim of UMB Bank, N.A., as successor indenture trustee for the first lien notes (the "First Lien Noteholders") (collectively, the "First Lien Creditors"). Both proofs of claim assert secured claims. In its objections, Wilmington contends that the First Lien Creditors have waived their rights under section 1111(b)(1)(A) of the Bankruptcy Code to assert unsecured deficiency claims.

For the reasons that follow, Wilmington's objections will be overruled.

### 1. Jurisdiction

The court has subject matter jurisdiction of this case under 28 U.S.C. § 1334(a) and the district court's Internal Operating Procedure 15(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

### 2. Facts

The facts are drawn from the evidence adduced at the hearing, the parties' stipulation, and the court's docket.

The debtors in these cases are the primary operating units of what the parties call the Caesars gaming enterprise. The debtor in the lead case is Caesars Entertainment Operating Co., Inc. ("CEOC"). The other debtors are subsidiaries of CEOC.

On January 28, 2008, affiliates of Apollo Global Management, Inc., and TPG Capital, LP, acquired CEOC and its subsidiaries in a leveraged buyout (the "LBO"). (Stip. ¶ 28).[1] As part of the LBO, CEOC entered into an agreement with the First Lien Bank Lenders to borrow $7.25 billion (the "Credit Agreement"). (*Id.*; *see also* Tr. at 84). Along with the Credit Agreement, CEOC and its subsidiaries entered into a collateral agreement (the "Collateral Agreement") under which they pledged assets to secure the Credit Agreement debt. (Stip. ¶ 28). On February 1, 2008, CEOC issued more debt in the form of 10.75% unsecured notes. (Stip. ¶ 34; Tr. at 84–85). The subsidiaries guaranteed the unsecured notes. (Stip. ¶ 34).

---

1. The hearing transcript is cited in this decision as "Tr. at ___." The parties' stipulation is cited as "Stip. ¶ ___." Wilmington's exhibits are cited as "W. Ex. ___." The First Lien Creditors' exhibits are cited as "F.L. Ex. ___."

Several months later, on June 10, 2009, CEOC issued still more debt in the form of secured notes (the "first lien notes"). (Stip. ¶¶ 4, 40). To complete the transaction, the Credit Agreement was amended and restated to permit the issuance of the first lien notes. (Tr. at 111–112). The Collateral Agreement was amended and restated to ensure the collateral secured the notes. (Stip. ¶ 40; Tr. at 111). And the First Lien Bank Lenders and Noteholders entered into an intercreditor agreement governing their respective rights to the collateral (the "Intercreditor Agreement"). (Stip. ¶ 41; Tr. at 112–114). The Intercreditor Agreement appointed an agent (the "Collateral Agent") to act on the First Lien Creditors' behalf. The Collateral Agent was authorized, among other things, to acquire, hold, and enforce the liens on collateral. (F.L. Ex. 15 at 14–15).

Three provisions in the contract documents from the 2009 issuance of the first lien notes are relevant here. First, section 7.18 of the Collateral Agreement limited the First Lien Creditors' recovery from the subsidiaries to the value of the collateral:

> No Recourse. Notwithstanding anything to the contrary in this Agreement, no recourse shall be had, whether by levy or execution, or under any law, or by the enforcement of any assessment or penalty or otherwise, for the payment of any of the Obligations, against any Pledgor or any of the assets of any Pledgor, other than the Collateral, it being expressly understood that the sole remedies available to the [Collateral Agent] and the Secured Parties pursuant to this Agreement with respect to the Obligations shall be against the Collateral.

(W. Ex. 16 at 34).

Second, section 4.10(b) of the Intercreditor Agreement protected the Collateral

Agent from liability arising from an election under section 1111(b) of the Code, 11 U.S.C. § 1111(b): "Each of the First Lien Secured Parties waives any claim ... against the Collateral Agent ... arising out of ... any election by any Applicable Authorized Representative or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code ...." (F.L. Ex. 15 at 14–15).

Third, section 7.22 of the Collateral Agreement subjected the Collateral Agent's exercise of rights and remedies to the Intercreditor Agreement's provisions and in the event of a conflict deferred to the Intercreditor Agreement:

> Subject to First Lien Intercreditor Agreement. Notwithstanding anything herein to the contrary, ... (ii) the exercise of any right or remedy by the [Collateral Agent] hereunder is subject to the limitations and provisions of the [Intercreditor Agreement]. In the event of any conflict between the terms of the [Intercreditor Agreement] and the terms of [the Collateral Agreement], the terms of the [Intercreditor Agreement] shall govern.

(W. Ex. 16 at 36).

On January 15, 2015, CEOC and the debtor subsidiaries filed voluntary chapter 11 petitions in this district. (Stip. ¶ 10). Through their agents, the First Lien Creditors filed proofs of claim against CEOC and each subsidiary. (Stip. ¶¶ 13–14). The First Lien Bank Lenders asserted a claim of "at least $5,354,400,000" against each subsidiary. The First Lien Noteholders asserted a claim of "not less than $6,530,577,083.33" against each subsidiary. (*Id.*).[2] Each proof of claim asserted a fully

---

**2.** The First Lien Bank Lenders and First Lien Noteholders each filed a single proof of claim

secured claim. In an attachment, each proof of claim also asserted an unsecured claim to the extent the claim amount exceeded the value of the subsidiaries' collateral.

Wilmington has objected to the First Lien Creditors' claims to the extent they asserted unsecured deficiency claims. (Bankr. Dkt. Nos. 2030, 2031). Wilmington contends that section 7.18 of the Collateral Agreement made the debts to the First Lien Creditors non-recourse, limiting any recovery to the collateral. Although section 1111(b)(1)(A) of the Code alters that result in bankruptcy, Wilmington contends that in section 7.18 the First Lien Creditors waived their rights under section 1111(b)(1)(A) to assert unsecured deficiency claims.

### 3. Discussion

Wilmington's objections will be overruled. The language in section 7.18 on which Wilmington relies is broad and if read in isolation might be found a waiver of rights under section 1111(b)(1)(A). But section 7.18 cannot be read in isolation. Under New York law (which the parties agree applies here (*see* Bankr. Dkt. Nos. 3138 at 12, 3139 at 2, 3142 at 7 n.12)), the Collateral Agreement must be read together with the other contract documents executed as part of the parties' 2009 transaction. When the documents are read together, the most reasonable interpretation is that the First Lien Creditors did not intend to waive their section 1111(b) rights.

#### a. Ripeness

At an April 13 hearing intended as the ruling date, the court questioned whether the objections presented a justiciable issue. The question was raised because it was not evident the First Lien Creditors had unsecured deficiency claims in the first place. To have them, the First Lien Creditors would have had to have been undersecured, with the collateral securing their claims worth less than the claim amounts. But the record gave no indication how much the collateral was worth. The proofs of claim themselves did not value the collateral.[3] The parties had not stipulated to value. And no evidence of value was introduced at the hearing.[4] Until the collateral was valued, it appeared, Wilmington's objections were not ripe.

The First Lien Creditors were asked at the hearing whether they would stipulate that they were undersecured, allowing a decision to be issued. When they had no immediate answer, the First Lien Creditors along with Wilmington and other parties in interest were given time to file statements of position on justiciability. (Bankr. Dkt. No. 3544). In their statement, the First Lien Creditors decline to stipulate even as a general matter to the value of their collateral, declaring that doing so would be "premature and inappropriate." (*Id.* No. 3653 at 2). With no evidence of value, they add, a ruling on the claim objections would be an advisory opinion and beyond the court's subject matter jurisdiction. (*Id.* at 3–4). Wilmington and the

---

intended to serve as a claim against the estates of each debtor. (*See* Bankr. Dkt. Nos. 2030 at 1 n.3, 2031 at 1 n.3).

**3.** It would not have mattered if they had. *In re Hudson*, 260 B.R. 421, 431 (Bankr. W.D. Mich. 2001) ("Nothing in the Bankruptcy Code or Rules gives any evidentiary effect whatsoever to a secured creditor's asserted value of collateral . . . .").

**4.** Valuation in the course of the claim objection proceeding would have been improper in any event. *In re Duggins*, 263 B.R. 233, 238 (Bankr. C.D. Ill. 2001) (noting that valuation under section 506(a) "is not properly part of the claims allowance process").

Unsecured Creditors' Committee take the opposite view. (*Id.* Nos. 3652, 3654).

█ After careful consideration, the court finds the claim objections present no jurisdictional problem, and the issue they pose is ripe for decision. Ripeness is a doctrine of justiciability "invoked to determine whether a dispute has yet matured to a point that warrants decision." 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* ¶ 3532 at 365 (3d ed. 2008). Sometimes ripeness is considered jurisdictional—but sometimes it is not. *See Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 538 (7th Cir. 2006); *South Austin Coal. Cmty. Council v. SBC Commc'ns Inc.*, 191 F.3d 842, 844 (7th Cir. 1999) ("Whether the district judge should have equated lack of ripeness to lack of subject-matter jurisdiction is debatable . . . .").

█ Ripeness presents a constitutional issue and thus a jurisdictional one only when a plaintiff's injury "depend[s] on so many future events that a judicial opinion would be advice about remote contingencies." *Sadowski*, 441 F.3d at 538. At that point, ripeness "is part of the case-or-controversy requirement in Article III." *Id.*[5] In less extreme situations, however, ripeness is "a question of timing rather than a limit on subject-matter jurisdiction." *Id.* (internal quotation omitted). Then, ripeness concerns "the appropriate exercise of discretion rather than the limits of judicial power." *Brandt v. Village of Winnetka*,

612 F.3d 647, 649 (7th Cir. 2010). The distinction is between "constitutional ripeness and prudential ripeness." *Cassim v. Educational Credit Mgmt. Corp. (In re Cassim)*, 395 B.R. 907, 911 (6th Cir. BAP 2008); *see also* 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *supra*, § 3532.1 at 374 (distinguishing between Article III limits and "a common-sense refusal to decide issues that have not yet become germane in purely private litigation").

█ The ripeness question here is prudential rather than constitutional. The dispute between the First Lien Creditors and Wilmington is "purely private," suggesting prudential ripeness. 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *supra*, § 3532.1 at 374. A ripeness problem exists, moreover, only because the collateral securing the claims has yet to be valued. *Id.* Valuation is a single issue. A decision on the claim objections thus does not turn on "many future events," making a decision "advice about remote contingencies." *Sadowski*, 441 F.3d at 538. And although the claim objections technically depend on a valuation about which one can only speculate, they form "part of a larger controversy"—the proposal and confirmation of a plan that will classify and treat creditors' claims—that is "neither conjectural nor speculative" but is ongoing. *Id.* (finding insurance coverage dispute ripe because it was part of the larger, ongoing controversy over the insured's liability).[6]

5. Wilmington and the Committee contend the jurisdictional limits of Article III do not apply to bankruptcy cases. The contention is frivolous. *See In re FedPak Sys., Inc.*, 80 F.3d 207, 211–13 (7th Cir. 1996); *Goldstein v. National City Mortg. Co. (In re Bulgarea)*, Nos. 08 B 19992, 08 A 1019, 2010 WL 3614278, at *5 (Bankr. N.D. Ill. Sept. 9, 2010) ("The limits Article III imposes on federal jurisdiction generally apply equally to bankruptcy courts."); *In re Trans World Airlines, Inc.*, 169 B.R. 91, 93–94 (Bankr. D. Del. 1994); *In re Interpictures, Inc.*, 86 B.R. 24, 29 (Bankr. E.D.N.Y. 1988).

6. At least one circuit, the Ninth, refuses to apply prudential ripeness principles to purely private contract disputes. *See Golden*, 782 F.3d at 1086. The Seventh Circuit does not appear to have addressed the question directly, but *Sadowski* suggests that court would take a different view. Even the Ninth Circuit

Whether to address the objections thus involves "an exercise of discretion" rather than a jurisdictional decision. *Brandt*, 612 F.3d at 649.

■ Prudential ripeness weighs two factors: " 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.' " *Wisconsin Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011) (quoting *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (internal quotation omitted)); *see also Golden v. California Emergency Physicians Med. Grp.*, 782 F.3d 1083, 1086 (9th Cir. 2015); *Center for Biological Diversity v. E.P.A.*, 722 F.3d 401, 408 (D.C. Cir. 2013); *National Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 691 (2d Cir. 2013); *Awad v. Ziriax*, 670 F.3d 1111, 1124 (10th Cir. 2012). Both factors favor addressing the claim objections here.

■ First, the issue they raise is fit for decision. The "fitness" factor is designed "to delay consideration of the issue until the pertinent facts have been well-developed in cases where further factual development would aid the court's consideration." *Coleman*, 560 F.3d at 1009. The facts underlying the claim objections are undisputed—virtually all of the facts have been stipulated—and no additional facts would aid a decision. The issue presented is one of contract interpretation and so is one of law, not fact. *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324, 834 N.Y.S.2d 44, 47, 865 N.E.2d 1210 (2007). "Claims that present purely legal issues are normally fit for judicial decision." *Barland*, 664 F.3d at 148; *see also Awad*, 670 F.3d at 1124; *Coleman*, 560 F.3d at 1009 (not-

ing that "a case is more likely to be 'fit' if it involves pure legal questions that require little factual development" (internal quotation omitted)).

Second, the hardship in not deciding the claim objections would be considerable. Wilmington and the First Lien Creditors have already engaged in discovery, participated in an evidentiary hearing, and briefed the contractual issue not once but twice (first when the claim objections were filed and again in conjunction with the hearing). Whatever cost the litigation might have entailed, then, has been incurred. Judicial resources have been spent, as well: a decision has been ready since April 13. Nothing will be saved, and those efforts will potentially have been wasted, if the decision is postponed. *See* 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *supra*, § 3532.1 at 372–74 (noting that ripeness is designed to conserve "judicial energies" and avoid forcing litigants to "bear the burdens" of unnecessary litigation).

The parties that a postponement would affect, moreover, include more than just Wilmington and the First Lien Creditors. If successful, Wilmington's objections would benefit other unsecured creditors. (Hence the submission from the Unsecured Creditors' Committee urging a decision.) A victory for the First Lien Creditors, on the other hand, would be a victory for the second lien noteholders as well—if, as Wilmington asserts, those noteholders are subject to an agreement with the same contractual language, so that any deficiency claims they might have would "be subject to disallowance for the same reasons . . . ." (Bankr. Dkt. Nos. 2030 at 3 n.5, 2031 at 3 n.5). The battle, in other words, is broader than it appears.

employs prudential ripeness in bankruptcy cases raising issues under the Code. *See In re*

*Coleman*, 560 F.3d 1000, 1006–07 (9th Cir. 2000).

Then there is the battleground itself to consider. The contractual dispute here is part of a much bigger bankruptcy puzzle, one the parties hope to solve through confirmation of a consensual plan. To that end, they have retained a private mediator, and the negotiations in which they have engaged off and on since the cases were filed have reportedly intensified of late. Even after many weeks, however, no resolution has been reached. A decision on the objections could assist the settlement effort. To delay would serve only to keep alive a contractual dispute fit for decision now, "prevent[ing] the litigants from shaping a settlement strategy and thereby avoiding unnecessary costs." *ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 666 F.2d 819, 823 (6th Cir. 1981) (finding insurance coverage dispute ripe although underlying liability had not been determined).[7]

The only obstacle to a decision, finally, is "the circumstance always present where ripeness questions occur, that the issue . . . is one that in the end may never require adjudication." *1108 K Street Assoc. v. Jewett*, Nos. 91–1548, 91–1627, 91–1628, 1992 WL 237248, at *7 (4th Cir. Sept. 5, 1992). Again, the relevance to the bankruptcy cases of a ruling on the contractual issue depends on a valuation of collateral that has not happened. But that obstacle is more apparent than real because a valuation *will* happen, unless the parties arrive at a consensual plan, no later than the plan confirmation hearing. *See Hudson*, 260 B.R. at 431 n.18 (describing the procedural

contexts in which valuation can take place, one of which is "a confirmation hearing"). The disclosure statement hearing is one week away, and the debtors project a confirmation hearing in six months. The contingency is not "remote," *Sadowski*, 441 F.3d at 538, or even much of a contingency.

Because the issue presented is fit for judicial decision and all parties would suffer a hardship if a decision were withheld, the parties' dispute is ripe for resolution.[8]

### b. Section 1111(b)(1)(A)

To understand that dispute, some background on section 1111(b)(1)(A) is helpful. A secured claim under the Bankruptcy Code "means something different" from its meaning outside of bankruptcy. *In re Okosisi*, 451 B.R. 90, 93 (Bankr. D. Nev. 2011). Outside of bankruptcy, a secured creditor is considered secured regardless of the value of its collateral. *Wong v. Green Tree Servicing, LLC (In re Wong)*, 488 B.R. 537, 544 (Bankr. E.D.N.Y. 2013). In bankruptcy, on the other hand, section 506(a) of the Code bifurcates a secured creditor's claim. 11 U.S.C. § 506(a). The creditor has a secured claim only up to the value of the collateral; the rest of the claim is unsecured. *Ryan v. United States (In re Ryan)*, 725 F.3d 623, 624 (7th Cir. 2013).

Sometimes, a secured creditor will lend on a non-recourse basis, meaning that upon a default the creditor can satisfy the debt only from the collateral itself; the

7. Most of the time "uncertainty promotes settlements." *Caesars Ent'mt Operating Co., et al. v. BOKF, N.A., et al.*, No. 64 N.H. 568, 15 A. 149 (Bankr. N.D. Ill. Feb. 26, 2016). But not always. When uncertainty fails, certainty may help.

8. It is worth noting that the First Lien Creditors never asserted the dispute was unripe or a decision premature until the court itself raised the issue at the April 13 hearing and

sought statements of position. In their preliminary objection, the First Lien Bank Lenders suggested in a single sentence that the objections concerned "issues such as valuation, subordination, and intercreditor relationships, among others, that are more appropriately suited for confirmation." (Bankr. Dkt. No. 2229 at 3). But the argument was never developed. The parties' evident desire for a decision suggests the issue is fit for decision. *See Jewett*, 1992 WL 237248, at *7.

creditor cannot recover from (i.e., has no recourse against) the debtor personally. *See* 7 *Collier on Bankruptcy* ¶ 1111.03[1][a][i] at 1111–15 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016). With non-recourse claims, however, the bifurcation under section 506(a) can prove unfair. Under section 506(a), the court decides the amount of the creditor's claim by valuing the collateral. *Id.* ¶ 1111.03[1][a][ii][A]–[B]. Since the claim is non-recourse, any unsecured deficiency claim is disallowed. *Id.* ¶ 1111.03[1][a][ii][B] at 1111–17. If the amount of the claim exceeds the court's valuation, an undersecured non-recourse creditor ends up "with neither full payment of the loan nor the right to foreclose on the property, resulting in a windfall to the debtor." *In re B.R. Brookfield Commons No. 1 LLC*, 735 F.3d 596, 600 (7th Cir. 2013).

Congress enacted section 1111(b)(1)(A) to prevent such a windfall. *Id.*; 7 *Collier on Bankruptcy*, *supra*, ¶ 1111.03. Section 1111(b)(1)(A) declares: "A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 . . . the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse." 11 U.S.C. § 1111(b)(1)(A). Under this provision, state law and non-recourse agreements are ignored. 7 *Collier on Bankruptcy*, *supra*, ¶ 1111.03[1][a] at 1111–14. "[A] secured claim becomes a recourse claim automatically with the filing of a chapter 11 petition" no matter what the loan agreement says. *See* 1 *Collier on Bankruptcy*, *supra*, ¶ 1.07[3][d][vi] at 1–39.

Section 1111(b) entitles a creditor to have its non-recourse claim treated as recourse "because the judicial valuation specific to Chapter 11 was not part of a nonrecourse creditor's bargain." *Brook-*

*field Commons*, 735 F.3d at 600. By treating a secured creditor's non-recourse claim as recourse, section 1111(b)(1)(A) "allows the debtor to retain the property and effectuate its reorganization, but without frustrating the lienholder's rights." *680 Fifth Ave. Assocs. v. Mutual Benefit Life Ins. Co. in Rehab. (In re 680 Fifth Ave. Assocs.)*, 29 F.3d 95, 97 (2d Cir. 1994). The potential unfairness of section 506(a) is thus avoided.

### c. The Waiver Theory

■ Section 7.18 of the Collateral Agreement unquestionably makes the obligations of CEOC's subsidiaries to the First Lien Creditors non-recourse. Outside of bankruptcy, the First Lien Creditors would accordingly have rights only against the collateral. In bankruptcy, section 1111(b)(1)(A) treats their non-recourse claims as recourse. Wilmington argues, however, that in the Collateral Agreement the First Lien Creditors waived that treatment because section 7.18 provided that "no recourse shall be had . . . under any law." Therefore, Wilmington maintains, the claims remain secured only and have no unsecured deficiency component.

■ This argument has considerable force. Under New York law, the "primary objective" of contract interpretation is "to give effect to the intent of the parties as revealed by the language of their agreement." *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co.*, 773 F.3d 110, 113–14 (2d Cir. 2014) (internal quotation omitted); *see also Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170, 750 N.Y.S.2d 565 (2002) ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."). The best evidence of the parties' intent "is what they say in their writing." *Greenfield*, 98 N.Y.2d at 569, 750 N.Y.S.2d 565, 780 N.E.2d at 170. When

that writing is unambiguous on its face, it "must be enforced according to the plain meaning of its terms." *Id.*; *see also South Road Assocs., LLC v. I.B.M. Corp.*, 4 N.Y.3d 272, 277, 826 N.E.2d 806, 809, 793 N.Y.S.2d 835 (2005).

The plain meaning of the phrase "recourse ... under any law" includes recourse under the Bankruptcy Code. "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997) (quoting Webster's Third New International Dictionary 97 (1976)); *see also Norfolk S. Ry. v. Kirby*, 543 U.S. 14, 31, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004) (interpreting contract); *United States v. Winans*, 748 F.3d 268, 272 (6th Cir. 2014) ("Any means any."). And the Bankruptcy Code, a federal statute, is indisputably a "law." *Cf. Walsh v. Dively (In re Dively)*, 522 B.R. 780, 783 (Bankr. W.D. Pa. 2014) (holding ERISA provision declaring that ERISA may not be interpreted to alter or impair "any law of the United States" applied to Code provisions), *aff'd*, 551 B.R. 570 (W.D. Pa. 2016). So when section 7.18 says on its face that the First Lien Creditors have no recourse "under any law," it means they have no recourse under the Bankruptcy Code—including section 1111(b)(1)(A).

Although this conclusion seems inescapable, the First Lien Creditors offer several arguments to escape it.

■ • The First Lien Creditors argue that a different meaning follows if the phrase is read in the context of section 7.18 as a whole. Their contextual argument is based on the doctrine *noscitur a sociis*: a word's meaning depends on the meaning of adjacent words. But that doctrine applies only when contract terms are ambiguous. *Bilski v. Kappos*, 561 U.S. 593, 604, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010);

*United States v. Stevens*, 559 U.S. 460, 474, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010); *see also Kese Indus., Inc. v. Roslyn Torah Found.*, 15 N.Y.3d 485, 491, 914 N.Y.S.2d 704, 708, 940 N.E.2d 530 (2010). The phrase "under any law" is not ambiguous. Even if it is, the First Lien Creditors fail to explain persuasively how the other words in section 7.18 limit its meaning.

■ • The First Lien Creditors argue that a finding of waiver under New York law requires a showing Wilmington has not made. They contend that a waiver "must be clearly established and cannot be inferred from doubtful or equivocal acts or language." *East 56th Plaza, Inc. v. Abrams*, 91 A.D.2d 1129, 1130, 458 N.Y.S.2d 953, 955 (1983); *see also Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104, 817 N.Y.S.2d 606, 611, 850 N.E.2d 653 (2006) (stating that a waiver "should not be lightly presumed" and requires "a clear manifestation of intent" (internal quotation omitted)). But the cases the First Lien Creditors cite—*East 56th Plaza* and others—involved waivers of contract breaches through post-breach conduct, not waivers in the contracts themselves. New York law permits the contractual waiver of statutory and even constitutional rights unless the waiver violates public policy. *Hadden v. Consolidated Edison Co.*, 45 N.Y.2d 466, 469, 382 N.E.2d 1136, 1138, 410 N.Y.S.2d 274 (1978). All that is necessary is an "express agreement." *Id.* Section 7.18 is an express agreement.

• The First Lien Creditors insist a waiver would be ineffective because rights under the Bankruptcy Code cannot be waived. True, debtors have been held protected against purported prepetition contractual waivers of the benefits of bankruptcy. *See, e.g., Klingman v. Levinson*, 831 F.2d 1292, 1296 n.3 (7th Cir. 1987). But debtors are one thing, creditors another.

There is no similar protection for creditors—particularly not large, sophisticated creditors represented by large, sophisticated law firms. *See, e.g., In re American Roads LLC*, 496 B.R. 727, 732 (Bankr. S.D.N.Y. 2013); *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re Ion Media Networks, Inc.)*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009). A contrary decision from this district, *Bank of Am. v. North LaSalle St. L.P. (In re 203 N. LaSalle St. P'ship)*, 246 B.R. 325 (Bankr. N.D. Ill. 2000), is unconvincing.

Read by itself, then, section 7.18 suggests that the First Lien Creditors have no section 1111(b)(1)(A) rights, and Wilmington's objections should be sustained.

### d. The Contract Documents Read Together

But section 7.18 cannot be read by itself. The language of that section must be considered not just in the context of the Collateral Agreement but in the context of all the other documents executed as part of the same transaction—in effect, taking them as a single agreement. Read as a single agreement, the contract documents exclude section 1111(b)(1)(A) from the otherwise broad reach of section 7.18.

 Under New York law, contractual language cannot be read in isolation but must be considered in light of the entire agreement. *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404, 892 N.Y.S.2d 303, 307, 920 N.E.2d 359 (2009). When a single transaction involves multiple writings, those writings are treated as the entire agreement and read together. *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998); *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197, 36 N.E.2d 106, 110 (1941).

Whether multiple writings should be taken as a single agreement depends on the intent of the parties, a question of fact. *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005). But if the writings "reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court." *Id.; accord Genger v. Genger*, 76 F.Supp.3d 488, 497 (S.D.N.Y. 2015).

There is no ambiguity here. The relevant transaction is CEOC's 2009 issuance of the first lien notes. The parties' agreement consisted of multiple documents, including the Collateral Agreement, the Credit Agreement, and the Intercreditor Agreement. These documents were plainly "part of a single transaction ... designed to effectuate the same purpose," *This Is Me, Inc.*, 157 F.3d at 143, since each was executed, or amended and restated, to permit the issuance of the first lien notes and to ensure that the collateral CEOC and its subsidiaries had pledged to the First Lien Bank Lenders also secured the new debt.

That these documents together formed a single agreement is evident not only from the structure of the transaction but also from the terms of the Intercreditor Agreement. The Intercreditor Agreement contains an integration clause expressly entitled "Integration." It provides: "This Agreement together with the other Secured Credit Documents and the First Lien Security Documents represents the agreement of each of the Grantors and the First Lien Secured Parties with respect to the subject matter hereof ...." (F.L. Ex. 15 at 22).[9] The Intercreditor Agreement defines "Secured Credit Document" to include the Credit Agreement and the "Loan Documents (as defined in the Credit Agreement)." The Credit Agreement de-

---

**9.** The Intercreditor Agreement defines "Grantors" to include the subsidiaries pledging collateral under the Collateral Agreement. (F.L. Ex. 15 at 4).

fines "Loan Documents" to include "Security Documents" which in turn includes the Collateral Agreement. (F.L. Ex. 15 at 7; F.L. Ex. 11 at 57, 77).

The documents are also intertwined in other ways. They refer to each other repeatedly and depend on one another for several defined terms. (*See, e.g.,* F.L. Ex. 15 at 4–6; W. Ex. 16 at 2, 7; F.L. Ex. 11 at 30, 60–61, 66). The Collateral Agreement refers to the Intercreditor Agreement more than twenty times, makes the Collateral Agent's rights and remedies subject to the Intercreditor Agreement, and defers to the Intercreditor Agreement if any terms conflict. (W. Ex. 16 at 36). The Intercreditor Agreement is similarly dependent on the Collateral Agreement. It sets priorities for the distribution of the collateral pledged under the Collateral Agreement. (F.L. Ex. 15 at 7–8). Without the Collateral Agreement, the Intercreditor Agreement would serve no purpose. The parties could not possibly have meant them to be read separately. *Cf. Genger,* 76 F.Supp.3d at 496–97 (finding documents formed an integrated agreement where they made no sense without each other and attached and cross-referenced each other).

Reading the documents together blunts the force of Wilmington's argument. Unlike the Collateral Agreement, the Intercreditor Agreement addresses section 1111(b) directly. Section 4.01(b) provides: "Each of the First Lien Secured Parties waives any claim . . . against the Collateral Agent . . . arising out of . . . any election by any Applicable Authorized Representative or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code . . . ." (F.L. Ex. 15 at 14–15). Under Wilmington's reading, section 7.18 would conflict with this provision. Section 7.18 says

the First Lien Creditors have no recourse "under any law," suggesting they have no rights under section 1111(b). Section 4.01(b) says the First Lien Creditors waive any claim against the Collateral Agent arising from a section 1111(b) election, suggesting the First Lien Creditors do have those rights.

 Under New York law, though, a contract must be interpreted in a way that gives "full meaning and effect to *all* of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,* 424 F.3d 195, 206 (2d Cir. 2005) (emphasis added) (internal quotation omitted); *accord Beal,* 8 N.Y.3d at 324, 834 N.Y.S.2d at 47–48, 865 N.E.2d 1210. That means two "seemingly conflicting" provisions must be interpreted in a way that reconciles them, if a reasonable reconciliation that gives effect to each is possible. *Seabury Constr. Corp. v. Jeffrey Chain Corp.,* 289 F.3d 63, 69 (2d Cir. 2002); *Lenart Realty Corp. v. Petroleum Tank Cleaners, Ltd.,* 116 A.D.3d 536, 537, 984 N.Y.S.2d 40, 41 (2014).

A reasonable reconciliation is certainly possible here. The phrase "under any law" in section 7.18, though broad enough on its face (and when read in isolation) to waive rights under section 1111(b)(1), must instead be read as more limited. In light of section 4.01(b), section 7.18 must be read as excepting section 1111(b) from the "law[s]" under which the obligations owed to the First Lien Creditors are non-recourse. Notwithstanding section 7.18, then, the First Lien Creditors retain their rights to treatment under section 1111(b)(1)(A).

 Limiting section 7.18 this way reconciles the two provisions and gives effect to both. It is consistent with the usual rule that where contract terms conflict, specific terms control over general ones (since section 4.01(b) is specific and section 7.18 general). *Hejna v. Reilly,* 88 A.D.3d 1119, 1120–21, 931 N.Y.S.2d 192, 193 (2011); *An-*

*dersen v. Andersen*, 69 A.D.3d 773, 774, 892 N.Y.S.2d 553, 555 (2010).[10] And it avoids reading section 4.01(b) in a way that would render superfluous its reference to section 1111(b) (since there would be no reason for section 4.01(b) to mention section 1111(b) if section 7.18 meant the First Lien Creditors had no section 1111(b) rights in the first place). *Beal Sav. Bank*, 8 N.Y.3d at 324, 834 N.Y.S.2d at 47–48, 865 N.E.2d 1210 (stating that contract terms should not be read to render them superfluous); *Lawyers' Fund for Client Prot. v. Bank Leumi Trust Co.*, 94 N.Y.2d 398, 404, 706 N.Y.S.2d 66, 69–70, 727 N.E.2d 563 (2000).

In short, section 7.18 supports Wilmington's position that the First Lien Creditors have waived their section 1111(b) rights— if that section is considered alone. But Wilmington fails to take into account the other writings making up the 2009 transaction. When those writings are read together, as New York law says they must be, the most reasonable conclusion is that section 7.18 accomplishes no waiver. Wilmington's claim objections must therefore be overruled.

### e. Wilmington's Remaining Arguments

In its objections, Wilmington makes its stand mostly on section 7.18, relying on the breadth of that section. Wilmington offers little that might lead to the same outcome when all of the contract documents are considered as a single agreement. What it does offer is unpersuasive.

Wilmington argues that the Collateral Agreement must be interpreted independently from the Credit and Intercreditor

Agreements. Because the subsidiaries are not parties to the Credit and Intercreditor Agreements, Wilmington says, the Collateral Agreement cannot be read together with those documents. Wilmington notes that section 7.09(b) of the Collateral Agreement provides: "Neither this Agreement nor any provision hereof or of any other Security Document may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Agent and the Loan Party or Loan Parties . . . ." (W. Ex. 16 at 30).

 Wilmington is mistaken. It makes no difference that the contract documents involve different parties as long as "the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 53 (2d Cir. 1993) (internal quotation omitted); *see also Genger*, 76 F.Supp.3d at 496–97. The documents here are interrelated in such a way that without the Collateral Agreement the 2009 transaction could not have been consummated. The Collateral Agreement recognizes as much in its recitals, stating that the subsidiaries executed the Collateral Agreement to induce the First Lien Creditors to extend credit. (W. Ex. 16 at 1). The Collateral Agreement is not a stand-alone document. As for section 7.09(b) of the Collateral Agreement, that provision is irrelevant. The purpose of reading the Credit Agreement and Intercreditor Agreement with the Collateral Agreement is not to "waive[ ], amend[ ], or modify[ ]"

---

**10.** Here, in fact, the terms of the parties' agreement would cause section 4.01(b) to control over section 7.18 even if section 4.01(b) were broader. The Collateral Agreement is expressly subject to the Intercreditor Agreement and provides in section 7.22 that

"[i]n the event of any conflict between the terms of the [Intercreditor Agreement] and the terms of [the Collateral Agreement], the terms of the [Intercreditor Agreement] shall govern." (W. Ex. 16 at 36).

its terms. The purpose is to determine the parties' intent, as New York law requires.

Wilmington also argues that section 1111(b) does not apply to the First Lien Creditors' claims at all. Wilmington points out that the CEOC subsidiaries themselves are not obligated on any of the first lien debt (neither the notes nor the bank loans). Because they are not, Wilmington continues, no payment could have been demanded from them outside of bankruptcy, and section 1111(b) does not entitle a non-recourse lender to assert claims against a debtor for the full amount of the debt when that amount was never the debtor's obligation.

 Again, Wilmington is mistaken. Section 1111(b) does exactly that. It provides recourse "whether or not recourse exists under applicable non-bankruptcy law." *680 Fifth Ave.*, 29 F.3d at 97. The only prerequisite for section 1111(b) to apply is that the creditor hold a "claim secured by a lien on property of the estate." 11 U.S.C. § 1111(b)(1)(A); *see also Brookfield Commons*, 735 F.3d at 599; *680 Fifth Ave.*, 29 F.3d at 98. The debtor and creditor need not be in "contractual privity" for the creditor to enjoy the "benefits and protection of section 1111(b)." *680 Fifth Ave.*, 29 F.3d at 98 (holding a creditor entitled to invoke section 1111(b) although the debtor held property subject to the creditor's mortgage but had no personal obligation on the debt). The First Lien Creditors do not lose the "benefits and protections" of 1111(b) merely because the subsidiaries did not borrow money under the Credit Agreement. *Id.*

Because the contract documents read together show that the First Lien Creditors did not intend section 7.18 of the Collateral Agreement to waive their section 1111(b) rights, Wilmington's claim objections will be overruled.

## 4. Conclusion

The objections of Wilmington Trust, N.A., as successor indenture trustee for the 10.75% senior unsecured notes, to the claims of Credit Suisse AG, Cayman Islands Branch, as agent on behalf of first lien lenders, and UMB Bank, N.A., as successor indenture trustee for the first lien notes, are overruled.